[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Cincinnati Enquirer v. Bloom*, Slip Opinion No. 2024-Ohio-5029.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-5029

THE STATE EX REL. CINCINNATI ENQUIRER *v.* BLOOM, JUDGE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Cincinnati Enquirer v. Bloom*, Slip Opinion No. 2024-Ohio-5029.]**

*Mandamus—Prohibition—Open-courts provision of Ohio Constitution prohibits closing a juvenile-delinquency proceeding to public without making an individualized determination balancing the interests at stake—Mandatory sealing of juvenile-delinquency records under R.C. 2151.356 unconstitutional—Writs granted.*

(No. 2022-1457—Submitted August 22, 2023—Decided October 22, 2024.)

IN MANDAMUS and PROHIBITION.

_____

DEWINE, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER and WALDICK, JJ., joined.  DONNELLY, J., concurred in judgment only, with an opinion.  STEWART, J., dissented, with an opinion joined by BRUNNER, J.

JUERGEN A. WALDICK, J., of the Third District Court of Appeals, sitting for DETERS, J.

**DEWINE, J.**

{¶ 1} The Ohio Constitution commands that "[a]ll courts shall be open." Ohio Const., art. I, § 16. We have long understood this "open courts provision" to encompass a right of the public not only to attend court proceedings but also to access the records of such proceedings. But, notwithstanding this constitutional command, the Ohio legislature has passed a statute that requires juvenile court judges to seal the records in delinquency cases when a juvenile has been found not to be delinquent. The statute imposes a blanket requirement—it does not allow for any individualized balancing of the juvenile's interest in keeping the proceedings secret against the public's interest in access to the proceedings.

{¶ 2} Relying on the statute, a juvenile court judge sealed the records of the trial of a juvenile who was alleged to have committed felonious assault by firing multiple shots at a victim. The Cincinnati Enquirer challenges the judge's order, arguing that the Ohio Constitution forbids the sealing of court records unless the judge makes an individualized determination that the harm to the juvenile from disclosure outweighs the potential benefits of public access. We agree. The plain text of the open courts provision and our traditional understanding of that provision demonstrate that the Enquirer's reading is correct. The statute violates the Ohio Constitution by requiring a blanket closure of the juvenile court proceedings. We grant a writ of mandamus ordering the juvenile court judge to provide access to the court records in question and a writ of prohibition precluding her from enforcing the order sealing the records.

## I. BACKGROUND

{¶ 3} In early 2022, Hamilton County Juvenile Court Judge Kari L. Bloom presided over the juvenile delinquency trial of thirteen-year-old J.L. According to

a sworn affidavit prepared by an assistant prosecutor, a Cincinnati police officer said he had witnessed J.L. stand over the victim and fire a gun continuously into his face-down body. Judge Bloom found J.L. not to be delinquent, dismissed the charge of felonious assault, and immediately sealed the case record pursuant to R.C. 2151.356(B)(1)(d). After J.L. was killed in a shooting a few months later, the Enquirer requested the transcript of J.L.'s earlier juvenile delinquency trial. Citing R.C. 2151.356, Judge Bloom denied the request without a hearing and refused to confirm whether the trial had even occurred.

{¶ 4} R.C. 2151.356(B)(1)(d) provides:

> The juvenile court shall promptly order the immediate sealing of records pertaining to a juvenile . . . [i]f a complaint was filed against a person alleging that the person was a delinquent child . . . and the court dismisses the complaint after a trial on the merits of the case or finds the person not to be a delinquent child . . .

{¶ 5} The Enquirer now challenges the constitutionality of R.C. 2151.356, relying on the open courts provision of the Ohio Constitution. The Enquirer argues that the statute violates this provision by mandating the sealing of court records without balancing the interests of the public against those of the juvenile. Judge Bloom argues that under this court's precedent, the public access protections of the open courts provision do not apply to juvenile delinquency proceedings and that the Ohio Constitution provides no greater right of public access to juvenile court proceedings than the Free Speech and Free Press guarantees of the First Amendment to the United States Constitution.

## II. ANALYSIS

### A. *The Open Courts Provision Has Traditionally Been Understood to Provide Citizens a Right to Observe the Administration of Justice*

{¶ 6} The open courts provision has been part of the Ohio Constitution since the State's founding. *See* 5 Thorpe, *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws* 2910 (1909).[1] Ohio's provision can be traced directly to the 1682 Frame of Government of the Colony of Pennsylvania and Laws Agreed Upon in England, signed by William Penn,[2] which is the "historical origin of the concept of 'open court' in the United States." *E.W. Scripps Co. v. Fulton*, 100 Ohio App. 157, 170-178 (8th Dist. 1955) (Hurd, J., concurring). That document provided, "That all courts shall be open, and justice shall neither be sold, denied nor delayed." 5 Thorpe at 3060. A similar open courts provision was then included in the Pennsylvania Constitutions of 1776 and 1790, before being adopted in modified form into the Kentucky Constitution of 1792 and remaining unchanged in the Kentucky Constitution of 1799.[3] As with many other provisions of Ohio's first Constitution, the open courts provision was copied almost verbatim from Kentucky's Constitution. *See* Barnhart, *Valley of Democracy* 158 (1953); Steinglass & Scarselli, *The Ohio Constitution* 23-24 (2d Ed. 2022). The 1802 open

---

1. Article VIII, Section 7 of the Ohio Constitution of 1802 provided, "That all courts shall be open, and every person for an injury done him in his lands, goods, person, or reputation shall have remedy by the due course of law, and right and justice administered without denial or delay."

2. Penn himself derived this provision from "the traditions of Magna Carta." Howard, *The Road from Runnymede* 88, 293 (1968).

3. *See* Pennsylvania Constitution of 1776, Frame, § 26, in 5 Thorpe at 3088 ("All courts shall be open, and justice shall be impartially administered without corruption or unnecessary delay"); Pennsylvania Constitution of 1790, art. IX, § 11, in 5 Thorpe at 3101 ("That all courts shall be open, and every man, for an injury done him in his lands, goods, person, or reputation, shall have remedy by the due course of law"); Kentucky Constitution of 1792, art. XII, § 13, in 3 Thorpe at 1275 ("That all courts shall be open, and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by the due course of law; and right and justice administered, without sale, denial, or delay"); Kentucky Constitution of 1799, art. X, § 13, in 3 Thorpe at 1290.

courts provision was incorporated almost unchanged into the 1851 Ohio Constitution. S*ee* Ohio Const., art. I, § 16. (There is no mention in the records of either the 1802 or the 1851 Constitution of any discussion or debate about the provision.) As a result of the 1912 constitutional convention, a provision was added to Article I, Section 16 to allow suits to be brought against the State, but the requirement that "[a]ll courts shall be open" was unaltered.[4]

{¶ 7} Historically, in construing the open courts provision, we have recognized that it encompasses a right of the citizenry "to observe the administration of justice." *State ex rel. The Repository v. Unger*, 28 Ohio St.3d 418, 420 (1986). We have also traditionally understood that the provision grants a "right of access," which "includes both the live proceedings and the transcripts which document those proceedings." *State ex rel. Scripps Howard Broadcasting Co. v. Cuyahoga Cty. Court of Common Pleas*, 73 Ohio St.3d 19, 21 (1995); *see also In re Disqualification of Celebrezze*, 2023-Ohio-4383, ¶ 49. While the right of access is not "absolute," we have held that court proceedings are presumptively open and any attempt to close the courts by sealing records or limiting attendance must be balanced against the public's interest. *Unger* at 421; *State ex rel. Cincinnati*

---

4. Ohio's open courts provision is one of the oldest open courts provisions in the country. Howard at 484-485. Including Ohio, 18 States provide that all "courts shall be open." *See* Alabama Const., art. I, § 13; Connecticut Const., art. I, § 10; Delaware Const., art. I, § 9; Florida Const., art. I, § 21; Indiana Const., art. I, § 12; Kentucky Const., art. I, § 14; Louisiana Const., art. I, § 22; Mississippi Const., art. III, § 24; Nebraska Const., art. I, § 13; North Carolina Const., art. I, § 18; North Dakota Const., art. I, § 9; Pennsylvania Const., art. I, § 11; South Dakota Const., art. VI, § 20; Tennessee Const., art. I, § 17; Utah Const., art. I, § 11; West Virginia Const., art. III, § 17; Wyoming Const., art. I, § 8. Five state constitutions provide that the courts shall be "open to every person." *See* Colorado Const., art. II, § 6; Idaho Const., art. I, § 18; Missouri Const., art. I, § 14; Montana Const., art. II, § 16; Oklahoma Const., art. II, § 6. Three provide that justice "shall be administered openly." *See* Arizona Const., art. II, § 11; Oregon Const., art. I, § 10; Washington Const., art. I, § 10. Finally, one provides that "[a]ll courts shall be public," South Carolina Const., art. I, § 9, and another provides that "Courts of Justice shall be open for the trial of all causes proper for their cognizance," Vermont Const., Ch. II, § 28. That means that identical or "substantially similar" provisions may be found in the majority of state constitutions. *State ex rel. The Repository v. Unger*, 28 Ohio St.3d 418, 423 (1986) (Celebrezze, C.J., concurring).

*Enquirer v. Winkler*, 2004-Ohio-1581, ¶ 9-11, *superseded by statute on other grounds as stated in Celebrezze*.

{¶ 8} But despite this understanding, a few decades ago we decided two cases in which we concluded that the open courts provision did not apply to juvenile court proceedings: *In re T.R.*, 52 Ohio St.3d 6 (1990), and *State ex rel. Plain Dealer Publishing Co. v. Geauga Cty. Court of Common Pleas, Juvenile Div.*, 2000-Ohio-79. Judge Bloom's argument that R.C. 2151.356 does not conflict with the open courts provision is rooted in this line of authority. In this view, because there is no constitutional right of public access to juvenile court proceedings, the legislature may enact legislation mandating the blanket closure of juvenile court proceedings. So we now turn to this line of cases.

*B. Our Recent Caselaw Has Improperly Concluded that the Open Courts Provision's Right of Public Access Does Not Apply to Juvenile Delinquency Proceedings*

{¶ 9} The open courts provision has been described as "a mandate in unequivocal terms . . . the meaning of which cannot be misconstrued," *Fulton*, 100 Ohio App. at 170 (Hurd, J., concurring), "clear and unambiguous" and "simplistic," *T.R.* at 25 (Douglas, J., concurring in part), and "clear and blunt," *Groch v. Gen. Motors Corp.*, 2008-Ohio-546, ¶ 229 (Pfeifer, J., concurring in judgment only). Despite such textual clarity, this court departed from this understanding of the open courts provision three decades ago by carving out an exception to the provision's application for juvenile court proceedings. *See T.R.*, 52 Ohio St.3d 6; *Geauga*, 2000-Ohio-35.

{¶ 10} In *T.R.*, this court dealt with a newspaper's challenge to a closure order in a juvenile custody and dependency proceeding. In analyzing the claim, the court announced that the open courts provision of the Ohio Constitution "creates no greater right of public access to court proceedings than that accorded by the Free Speech and Free Press Clauses of the First Amendment to the United States

6

Constitution and the analogous provisions of Section 11, Article I of the Ohio Constitution." *T.R.* at paragraph two of the syllabus. The court then noted that under the Free Speech and Free Press Clauses of the First Amendment of the federal Constitution, the United States Supreme Court has held that

> there is a federal constitutional right of access to proceedings in a criminal prosecution which have 'historically been open to the press and general public' and in which "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise* [*Co. v. Superior Court*, 478 U.S. 1, 8 (1986) ("*Press-Enterprise II*")]. . . . "If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches. . . ." *Id.* at 9. The proceeding is presumed open to the press and public. "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. . . ." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984) ("*Press-Enterprise I*").

*T.R.* at 12. The *T.R.* court then proceeded to adopt the United States Supreme Court's limitation on the public's right to access court proceedings as its own, holding that "the public's qualified right of access attaches to those hearings and proceedings in all courts which have historically been open to the public, and in which public access plays a significant positive role." *Id.* The court provided no rationale for adopting the federal test, noting only: "After reviewing the relevant authorities, we have concluded that the *Press-Enterprise II* test of 'experience and logic' accurately defines the limits of constitutionally protected public access to all

court proceedings," *id.* The court did not explain how the explicitly worded guarantee of the Ohio Constitution that "[a]ll courts shall be open" had the same meaning as the Free Speech and Free Press guarantees of the federal Constitution. It just said that it did.

{¶ 11} Applying the United States Supreme Court's test of experience and logic, the *T.R.* court concluded that there was no constitutional right of public access to juvenile court proceedings. *T.R.*, 52 Ohio St.3d at 14-17. In doing so, the court noted that juvenile courts did not exist at common law. *Id.* at 14-15. It also explained that juvenile courts "differ significantly from courts of general jurisdiction" because of their "mission" to "act as an insurer of the welfare of children and a provider of social and rehabilitative services." *Id.* at 15. And it said that "[t]he United States Supreme Court has repeatedly recognized that juvenile court proceedings have historically been closed to the public." *Id.* Thus, based on its conclusion that the *Press Enterprise II* test established "the limits of constitutionally protected public access," *T.R.* at 12, the court determined that neither the court access protections of the First Amendment of the United States Constitution nor the open courts provision of the Ohio Constitution applied to juvenile delinquency proceedings, *id.* at 17.

{¶ 12} After determining that neither state nor federal constitutional protections were applicable, the *T.R.* court turned to statutory law and rules. The court noted that there was no statute in that case which required the juvenile proceeding to be closed to the public. *Id.* at 17. But it identified two relevant provisions, R.C. 2151.35(A) and Juv.R. 27, which, it found, "authorize, but do not require" the exclusion of the public from juvenile hearings. *Id.* Based on those provisions allowing—but not requiring—closure, the court held that juvenile court abuse and neglect proceedings and custody proceedings "are neither presumptively open nor presumptively closed to the press and public." *Id.* at 18. The court then established a rule that a court may restrict public access to such proceedings only

if it determines after a hearing and argument that "(1) there exists a reasonable and substantial basis for believing that public access could harm the child or endanger the fairness of the proceeding, and (2) the potential for harm outweighs the benefits of public access." *Id.* at 18-19. In announcing this balancing test, the court declined to "decide the General Assembly's constitutional authority to enact a statute making juvenile court proceedings presumptively closed," but noted that other state courts had upheld such statutes despite constitutional challenges. *Id.* at 17.

{¶ 13} A decade later, this court applied the borrowed *Press-Enterprise II* test to another type of juvenile court proceeding. *Geauga*, 2000-Ohio-35. At issue in *Geauga* was the denial of media access to a juvenile delinquency proceeding. Returning to the United States Supreme Court's "tests of experience and logic," this court concluded that there was no constitutional right to access juvenile delinquency proceedings. *Id*. at ¶ 17-18. It reasoned that juvenile court proceedings "have historically been closed to the public, and public access to these proceedings does not necessarily play a significant positive role in the juvenile court process." *Id.* at ¶ 18. Thus, it held that "traditional interests of confidentiality and rehabilitation prevent the public from having a qualified constitutional right of access to juvenile delinquency proceedings." *Id.* at ¶ 19. It added that its determination that there was no constitutional presumption of access to juvenile delinquency proceedings "is consistent with the holdings of other courts." *Id.* (To support this statement it cited cases from Georgia, Vermont, and California, but neglected to mention that neither Georgia nor California has an open courts provision in its constitution, and Vermont's provision, while similar, is textually distinct from Ohio's.)

{¶ 14} Concluding that there was no constitutional right of access, the court explained that under R.C. 2151.35 and Juv.R. 27, a juvenile judge has discretion whether to close a proceeding. *Id.* at ¶ 14. It then applied the balancing test

announced in *T.R.* to find that the trial court had abused its discretion in closing the proceeding to the public. *Id.* at ¶ 34-43.

{¶ 15} The Enquirer and Judge Bloom have different takeaways from our caselaw. The Enquirer would require that the balancing test employed in *T.R.* and *Geauga* be applied to Judge Bloom's sealing order. Judge Bloom argues that because there is no constitutional right of access to juvenile proceedings, the enactment of R.C. 2151.356 obviates the need for any type of weighing of interests.

## 1. We have a duty to respect the independent force of our state Constitution

{¶ 16} Judge Bloom's contention that there is no constitutional right of public access to juvenile proceedings is grounded in our previous determination that the open courts provision means the same thing as the Free Speech and Free Exercise Clauses of the First Amendment. So we now return to the *T.R.-Geauga* line of precedent that tethered the meaning of the Ohio open courts provision to the United States Supreme Court's reading of the First Amendment's Free Speech and Free Press Clauses. We conclude that these cases were wrongly decided and should not be deemed controlling.

{¶ 17} The justice concurring in judgment only criticizes us for revisiting this line of cases and says we should simply apply the balancing test that this court applied in *T.R.* and *Scripps Howard*. But in *T.R.* and *Geauga*, we held that there is no constitutional right of public access to juvenile court proceedings, *T.R.*, 52 Ohio St.3d at 17; *Geauga*, 2000-Ohio-35, and we applied the balancing test because the statutory provisions at issue in those cases gave the juvenile court judge discretion whether to close the proceeding. The justice concurring in judgment only misunderstands the holding of these cases, saying that "[w]e created the weighing test in *Scripps* and *T.R.* to ensure that the process of closing juvenile-court proceedings remained above the floor of what might minimally be constitutionally required," opinion concurring in judgment only, ¶ 70. But this is not what those cases said at all. In *Scripps Howard*, this court adopted the *T.R.* test, and *T.R.* made

clear that the test was not a constitutional requirement. *See Scripps Howard,* 73 Ohio St.3d at 21; *T.R.* at 17-18. Instead, in *T.R.*, this court grounded the balancing test in statutory language that provided that "'the general public *may* be excluded'" from juvenile court proceedings. (Emphasis added in *T.R.*) *T.R.* at 17, quoting former R.C. 2151.35(A), 1988 Am.Sub.S.B. No. 89, 142 Ohio Laws, Part I, 198, 221. Moreover, the holdings in both *T.R.* and *Geauga* made clear that the open courts provision provided no greater protection than the United States Supreme Court's construction of the First Amendment in *Press-Enterprise II*, a case in which the Court concluded that there is "a First Amendment right of access," *Press-Enterprise II*, 478 U.S. at 3, only when its tests of experience and logic are satisfied, *id.* at 8-9. *See T.R.* at 12; *Geauga* at ¶ 17-18.

{¶ 18} Before a statute can be said to infringe on the public's right of access, we have to identify a source for that right of access. And since this court has found that a hearing and balancing test for court closures are only "required by precedent, statute, and rule," *State ex rel. Plain Dealer Publishing Co. v. Floyd*, 2006-Ohio-4437, ¶ 34—but not by the constitution—the Enquirer's claim cannot survive unless we overturn the *T.R.*-*Geauga* line of precedent and conclude that the open courts provision provides a stronger right of public access to juvenile delinquency proceedings than the United States Supreme Court's interpretation of the First Amendment.

{¶ 19} Our federal system provides citizens a "double security" for their liberties, which are guaranteed by two Constitutions, state and federal. Madison, The Federalist No. 51 at 323 (Clinton Rossiter Ed.1961). "The Ohio Constitution is a document of independent force," and—subject to the federal Supremacy Clause—we are "unrestricted" in interpreting it independently from the United States Constitution. *Arnold v. Cleveland*, 67 Ohio St.3d 35 (1993), paragraph one of the syllabus.

**{¶ 20}** By interpreting our state Constitution independently, we ensure that citizens are not deprived of rights guaranteed to them by that document. Indeed, properly understood, the federal Constitution provides a "floor" for individual rights, above which state constitutions may impose greater protections. *Id.*

**{¶ 21}** For a good portion of our nation's history, state constitutions were considered the primary protectors of individual rights. Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.Rev. 489, 501-502 (1977). But, unfortunately, a practice developed in many state courts—including our own—of searching for "analogous" provisions in the United States Constitution and declaring that the state Constitution meant the same thing as its purported federal counterpart. *See, e.g.*, *Direct Plumbing Supply Co. v. Dayton*, 138 Ohio St. 540, 544-545 (1941); *see also* Fouch, *"A Document of Independent Force": Towards a Robust Ohio Constitutionalism*, 49 U.Dayton L.Rev. 1, 21-26 (2023). This "reflexive imitation of the federal courts' interpretation of the Federal Constitution" has been described as "lockstepping." Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 174 (2018). By lockstepping, this court ignored the plain language of our state Constitution and its unique history and tradition and hooked our wagon to the United States Supreme Court, come what may.[5]

**{¶ 22}** But Ohio remains a sovereign State, and "the fundamental guaranties of the Ohio Bill of Rights have undiminished vitality." *Direct Plumbing Supply Co.* at 545. That means "we are not bound to walk in lockstep with the federal courts when it comes to our interpretation of the Ohio Constitution." *State v. Smith*, 2020-Ohio-4441, ¶ 28. Instead, "[i]t is our duty to keep within the light of our own

---

5. For a more in-depth critique of lockstepping, consider Sutton at 174-178; Linde, *E Pluribus— Constitutional Theory and State Courts*, 18 Ga.L.Rev. 165, 186-188 (1984); Blocher, *Reverse Incorporation of State Constitutional Law*, 84 S.Cal.L.Rev. 323, 332-341 (2011); and Williams & Friedman, *The Law of American State Constitutions*, 224-241 (2d Ed. 2023), among others.

Constitution," and not to grasp at inapplicable authorities beyond it. *Good's Lessee v. Zercher*, 12 Ohio 364, 369 (1843).

{¶ 23} Our opinion in *T.R.* is lockstepping at its most ill-considered. There is no textual similarity between the Ohio Constitution's guarantee that all courts shall be open and the federal Constitution's guarantees of the rights to freedom of speech and of the press. Indeed, the federal Constitution provides no explicit guarantee of open court proceedings beyond a criminal defendant's Sixth Amendment right to a "speedy and public trial."

{¶ 24} Further, the First Amendment's Free Speech and Free Press Clauses advance very different interests than Ohio's open courts provision. The former are concerned with protecting access to court proceedings insofar as such access is necessary to protect the right of free expression. In contrast, the open courts provision has been understood to protect a right of public access "on the belief that justice would be administered with greater fairness if the proceedings were open to the public." Harrison, *How Open is Open? The Development of the Public Access Doctrine Under State Open Court Provisions*, 60 U.Cin.L.Rev. 1307, 1331 (1992). Nonetheless, the court in *T.R.* decided that when it comes to open courts, the textually and historically distinct provisions of the two constitutions mean exactly the same thing.

{¶ 25} The court in *T.R.* didn't provide any analysis to support its conclusion that our state Constitution's open courts guarantee provides no greater (or different) rights than the federal Constitution. It didn't examine the history of the Ohio provision. It didn't analyze its text. It simply announced a result: a result that effectively read the open courts provision out of the Ohio Constitution.[6]

---

6. The dissent contends that "the court in *T.R. did* examine the history and the text," dissenting opinion, ¶ 115. It premises this claim on the fact that the *T.R.* court explained that there was no recorded debate about the provision at the constitutional conventions and on the *T.R.* court's reference to territorial grand-jury proceedings, which were closed to the public. *See T.R.*, 52 Ohio

## 2. The *T.R.* court's unreasoned declaration should not receive precedential effect

**{¶ 26}** There is no reasoned rationale to support the *T.R.* court's pronouncement that Ohio's open courts provision means nothing more than textually and historically dissimilar provisions in the federal Constitution. But the question remains: Should we adhere to *T.R.*'s holding simply on the basis of stare decisis? We conclude that the answer is no.

**{¶ 27}** While the doctrine of stare decisis is central to our judicial system, it "does not apply with the same force and effect when constitutional interpretation is at issue." *Rocky River v. State Emp. Relations Bd.*, 43 Ohio St.3d 1, 5 (1989); *see also State v. Bodyke*, 2010-Ohio-2424, ¶ 37 (lead opinion) (stare decisis "is not controlling in cases presenting a constitutional question"); Garner et al., *The Law of Judicial Precedent* 352 (2016) ("The doctrine of stare decisis applies less rigidly in constitutional cases than it does in statutory cases because the correction of an erroneous constitutional decision by the legislature is well-nigh impossible."). Put another way, "stare decisis does not compel adherence to an incorrect interpretation of the Constitution," *State ex rel. Ohioans for Secure and Fair Elections v. LaRose*, 2020-Ohio-1459, ¶ 88 (Kennedy, J., concurring). "A supreme court not only has the right, but is entrusted with the duty to examine its former decisions and, when reconciliation is impossible, to discard its former errors." *Westfield Ins. Co. v. Galatis*, 2003-Ohio-5849, ¶ 43.

**{¶ 28}** This is particularly true when it comes to decisions like *T.R.* in which this court adopted a lockstep reading of our state Constitution without any independent analysis of the constitutional provision. *See State v. Carter*, 2024-

---

St.3d at 13-14. What the dissent misses is that the *T.R.* court provided not a shred of textual or historical evidence to suggest that Ohio's open courts provision was intended to have exactly the same meaning as the differently worded free-speech and debate provisions of the First Amendment to the United States Constitution.

Ohio-1247, ¶ 58 (Fischer, J., concurring) ("parties should not hesitate to raise and vigorously argue claims under the Ohio Constitution, especially if this court has not analyzed the relevant constitutional provision in light of its plain text, history, and tradition"); *see also* Garner et al. at 226 ("The precedential sway of a case is directly related to the care and reasoning reflected in the court's opinion."); Bolick, *Principles of State Constitutional Interpretation*, 53 Ariz.St.L.J. 771, 782 (2021) ("Precedential effect [of lockstep-type opinions] is deserving only where the court gave fulsome analysis of why the provisions are coextensive . . . .").

{¶ 29} At its core, the kind of blind lockstepping represented by the *T.R.* opinion is difficult to square with our obligations as judges. After all, we take an oath to support not only the federal Constitution, but also our state Constitution. *See* Ohio Const., art. XV, § 7; R.C. 3.23. And our judicial duty is to say "'what the law is.'" *TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 2022-Ohio-4677, ¶ 43, quoting *Marbury v. Madison,* 5 U.S. 137, 177 (1803). But when we say that our state Constitution means whatever the United States Supreme Court says that the federal Constitution means, we ignore our obligation to the Ohio Constitution, and we delegate away our duty to say what the law is.

{¶ 30} There may, of course, be contexts in which it is appropriate to look to United States Supreme Court precedent in interpreting our state Constitution. When the drafters of our 1851 Constitution chose to use identical language to that contained in the federal charter, one might reasonably argue that they intended for the Ohio provision to have a similar meaning to the federal guarantee as it was understood at the time of adoption by the state. Even in such cases, however, it would still be inappropriate to "irreversibly tie" our state constitutional jurisprudence to *future* United States Supreme Court decisions. *See Simmons-Harris v. Goff*, 1999-Ohio-77, ¶ 30. But this case does not present such a scenario.

There is simply no parallel provision to Ohio's open courts guarantee in the federal charter.

**{¶ 31}** When a litigant has raised and preserved an argument under a provision of the Ohio Constitution that this court has previously, and without analysis, interpreted in lockstep with the United States Constitution, it is appropriate to revisit unreasoned prior precedent. Notwithstanding principles of stare decisis, when presented the appropriate opportunity, we may reexamine unreasoned pronouncements—like the one made in *T.R.*—that provisions of the Ohio Constitution mean the exact same thing as provisions of the federal Constitution. We will not do so lightly: "No one should assume that our decision heralds a new era in which prior cases of this court will be routinely or arbitrarily overruled," *Galatis*, 2003-Ohio-5849, at ¶ 67 (Moyer, C.J., concurring). But in cases like this one, it is appropriate.

**{¶ 32}** The dissent points to this court's practice of declining to analyze underdeveloped state constitutional claims to suggest that by analyzing the Enquirer's arguments we are abandoning principles of judicial restraint. Dissenting opinion, ¶ 118. Yet in each of the cases cited by the dissent, the parties had cited a state constitutional provision but had failed to adequately distinguish the state provision from federal provisions or argue that the state constitution offered greater protection. *See Carter*, 2024-Ohio-1247, at ¶ 32-34; *State v. Jordan*, 2021-Ohio-3922, ¶ 14; *Stolz v. J & B Steel Erectors*, *Inc.*, 2018-Ohio-5088, ¶ 12; *State v. Moore*, 2018-Ohio-3237, ¶ 22; *Cleveland v. Oles*, 2017-Ohio-5834, ¶ 31, fn. 1. Further, all but one of the cases relied on by the dissent involved federal constitutional claims with only a brief, undeveloped reference to the Ohio Constitution. *See Carter* at ¶ 34; *Jordan* at ¶ 14; *Moore* at ¶ 21; *Oles* at ¶ 5.

**{¶ 33}** Here, the Enquirer has raised and preserved an argument under the open courts provision of the Ohio Constitution. Indeed, it rests its argument solely on the Ohio Constitution, and it has not raised any claims under the federal

Constitution. So, of course, it is appropriate for us to consider the Ohio constitutional claims that were raised, rather than decide this case based on unraised federal constitutional grounds.

*C. The Open Courts Provision Applies to Juvenile Delinquency Proceedings*

**{¶ 34}** Now we turn to the proper understanding of Ohio's open courts provision and the question at the heart of this case: Does the open courts provision apply to juvenile delinquency proceedings?

**{¶ 35}** "In construing our state Constitution, we look first to the text of the document as understood in light of our history and traditions." *Smith*, 2020-Ohio-4441, at ¶ 29. Article I, Section 16 provides, in part, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." "[T]his one provision contains many important constitutional principles—'open courts,' 'right to remedy,' and 'due course of law.' " *Ruther v. Kaiser*, 2012-Ohio-5686, ¶ 10.[7]

**{¶ 36}** In our caselaw, we have often interpreted Article I, Section 16 without distinguishing between the individual phrases contained within it, as providing a right to litigants to access the court system. *See, e.g.*, *Lafferty v. Shinn*, 38 Ohio St. 46, 48 (1882); *Baltimore & Ohio R.R. Co. v. Stankard*, 56 Ohio St. 224, 231-232 (1897); *State ex rel. Christian v. Barry*, 123 Ohio St. 458, 464 (1931). But our precedent establishes that the phrase "all courts shall be open" retains its own force. *See Steele, Hopkins & Meredith Co. v. Miller*, 92 Ohio St. 115, 120 (1915)

---

7. The dissent purports to title Article I, Section 16 as "Redress for injury; Due process," but no such title is included in the Constitution itself. (Indeed, the phrase "due process" is found nowhere in the Constitution.) The dissent apparently takes the Ohio Legislative Service Commission's editorially added headings to be a part of the Ohio Constitution. *See* Legislative Service Commission, *Ohio Laws & Administrative Rules*, available at https://codes.ohio.gov/ohio-constitution/section-1.16 (accessed July 8, 2024) [https://perma.cc/2E38-34B8]. But these headings were never ratified by the people of Ohio and were added more than a century later.

("in the absence of a clear reason to the contrary no portion of a written Constitution should be regarded as superfluous").

{¶ 37} In rejecting the argument that the provision applies only to guarantee litigants a right to court access, one jurist explained:

> As the section now stands, there are three separate concepts, namely, (1) that the courts shall remain open; (2) that all persons shall have remedy for the redress of grievances; and (3) that suits may be brought against the state. The use of a comma after the word 'open,' followed by the conjunction 'and' is important here as connoting a separation of concepts. If the framers in convention assembled had intended otherwise, it is reasonable to conclude that they would have so said in plain, unambiguous and unmistakable terms. This idea is supported by records of the Constitutional debates which indicate great care on the part of the members of the Constitutional Conventions in the use of language to express their intentions. A review of the history of the Constitutional Conventions and the debates in connection therewith serves to emphasize this fact and to point up the three separate concepts now contained in [Article I, Section 16].

*Fulton*, 100 Ohio App. at 171 (Hurd, J., concurring). We agree. And we are not alone: "Most state courts agree that the [open courts] clause provides the public with an independent right of access to both civil and criminal judicial proceedings." Koch, *Reopening Tennessee's Open Courts Clause: A Historical Reconsideration of Article I, Section 17 of the Tennessee Constitution*, 27 U.Mem.L.Rev. 333, 446 (1997).

**{¶ 38}** Before this court conflated its interpretation of the open courts provision with the United States Supreme Court's First Amendment jurisprudence, the provision was understood to provide independent protections of the right of the public to access court proceedings. In a notable case decided in 1955, the Eighth District Court of Appeals found that the open courts provision provided a right of public access to criminal proceedings that was independent of the defendant's right to a public trial. *See Fulton*. We have held that the provision is violated by the holding of a trial inside a prison. *State v. Lane*, 60 Ohio St.2d 112 (1979). We have also held that the provision encompasses the right of the public to attend pretrial proceedings in a criminal case. *Unger*, 28 Ohio St.3d at 421. And the provision has been said to encompass civil proceedings as well as criminal. *Id.* at 424-425 (Celebrezze, C.J., concurring).

**{¶ 39}** There is no need here to endeavor to authoritatively interpret the full scope of the open courts guarantee. The Enquirer does not argue for an unfettered right to access under the open courts provision. Rather, the position advanced by the Enquirer is that there is a constitutional presumption of public access to juvenile delinquency proceedings and that this presumption cannot be overcome without an individualized finding that the harm to the juvenile from disclosure outweighs the potential benefits of public access. In short, the Enquirer simply asks that we apply the same constitutional presumption of public access to juvenile delinquency proceedings that we apply to adult criminal proceedings. To resolve this case, we need only to decide if the open courts provision extends at least as far as the Enquirer suggests. We hold that it does. Upon independent interpretation, we conclude that the open courts provision provides a presumption of public access to juvenile delinquency proceedings.

**{¶ 40}** The 1851 Constitution was adopted directly by the voters of Ohio. *See* Ohio Const., 1851 schedule. "In construing constitutional text that was ratified by direct vote, we consider how the language would have been understood by the

voters" who adopted the text. *Centerville v. Knab*, 2020-Ohio-5219, ¶ 22. The language of the open courts provision is straightforward and easily understandable: "All courts shall be open." Ohio Const., art. I, § 16. A citizen who voted to adopt the provision would have understood it to refer to proceedings like those at issue here.[8]

{¶ 41} In holding that the constitutional presumption of access does not apply to juvenile courts, the *Geauga* and *T.R.* courts placed great weight on their assumption that "[j]uvenile court proceedings have historically been closed to the public," *Geauga*, 2000-Ohio-35, at ¶ 18; *see also T.R.*, 52 Ohio St.3d at 15 ("The United States Supreme Court has repeatedly recognized that juvenile court proceedings have historically been closed to the public."). But the holdings in *T.R.* and *Geauga* were premised on the United States Supreme Court's caselaw construing the First Amendment—caselaw that said that the presumption of openness only applied in proceedings that have "historically been open to the press and general public," *Press-Enterprise II*, 478 U.S. at 8.

{¶ 42} Juvenile courts did not exist in Ohio at the time of the drafting of the 1802 or 1851 Ohio Constitutions. But under its plain terms, the open courts provision does not apply only to courts that were in existence at the time of its enactment. The provision speaks to "all courts"—a phrasing that a voter would understand to apply to all courts in Ohio regardless of what future changes the legislature might make in court structure or jurisdiction. Such a reading is consistent with Article IV, Section 1 of the Ohio Constitution, which broadly vests the judicial power in the "supreme court, courts of appeals, courts of common pleas

---

8. The justice concurring in judgment only criticizes us for relying on the plain text of the open courts provision to conclude that juvenile delinquency proceedings fall within the scope of the provision and also for looking to the historical evidence about court proceedings in 1851 to add further support to our conclusion. But without providing any analysis of the provision, the justice concurring in judgment only in granting the writ requested by the Enquirer necessarily determines that the open courts provision applies in juvenile delinquency proceedings. *See* opinion concurring in judgment only at ¶ 72.

and divisions thereof, and such other courts . . . as may from time to time be established by law." Thus, once we strip from our jurisprudence the inappropriate reliance on inapposite federal precedent, it becomes clear as a textual matter that the presumption of public openness required by the open courts provision applies to juvenile delinquency proceedings.

{¶ 43} But even if one does think that the open courts provision's scope is limited by the types of proceedings that existed at the time of its enactment, the provision would still encompass juvenile delinquency proceedings. When the open courts provision was adopted in 1802 and readopted under Ohio's second Constitution in 1851, juveniles accused of crimes were treated the same as adults and tried before the same courts as adults. *See* 2 Marshall, *A History of the Courts and Lawyers of Ohio* 439-440 (1934); *see also In re Gault*, 387 U.S. 1, 16 (1967) ("At common law, children under seven were considered incapable of possessing criminal intent. Beyond that age, they were subjected to arrest, trial, and in theory to punishment like adult offenders."). Juvenile courts were not established in Ohio for another 50 years. *See* S.B. No. 142, 95 Ohio Laws 785, 785-786 (effective May 1, 1902) (establishing the first juvenile court in Cuyahoga County) and S.B. No. 40, 97 Ohio Laws 561 (effective May 5, 1904) (establishing juvenile courts statewide). Even Ohio's statutory experiment authorizing a city to establish a group home as an alternative method for dealing with juvenile offenders was not passed into law until at least six years after the Constitution was adopted. *See* 54 Ohio Laws 163 (effective Apr. 16, 1857) (allowing a city to establish a "House of Refuge" where juveniles under the age of 16 who were charged with a crime could be committed as an alternative to incarceration).

{¶ 44} Juvenile courts in Ohio have long been understood to be a part of the Common Pleas Court—a court that predates the founding of this state. *See* 1 Chase, *Statutes of Ohio and of the Northwestern Territory, Adopted or Enacted from 1788 to 1833 Inclusive: Together with the Ordinance of 1787; the Constitutions of Ohio*

*and of the United States, and Various Public Instruments and Acts of Congress* 95 (1833); *see also* 2 Marshall at 365-366. Article III, Section 3 of the Ohio Constitution of 1802 presupposes the existence of "[t]he several courts of common pleas." The statute establishing the juvenile court in Hamilton County specifically provides that the jurisdiction and powers of the Hamilton County juvenile court are to be exercised by a "judge of the court of common pleas." R.C. 2151.08. Similarly, in other Ohio counties, the juvenile court is statutorily defined as a "division" of the court of common pleas, *see* R.C. 2151.011(A)(1)(a) and 2153.01, or, where no separate juvenile division exists, as part of the "probate division of the court of common pleas," *see* R.C. 2151.011(A)(1)(c). Thus, the phrase "juvenile court" is simply shorthand for the part of the common pleas court that handles juvenile proceedings.

{¶ 45} The historical analogue to present-day juvenile delinquency proceedings was a trial of the juvenile in adult court. There is no question that the open courts provision applied to such proceedings. So there should be no question that the open courts provision applies to juvenile delinquency proceedings.

{¶ 46} In reaching this conclusion, we do not "erase over a century of history and tradition as well as decades of established jurisprudence," dissenting opinion at ¶ 121. Rather, we hold simply that a statutory enactment cannot trump a constitutional provision. As the Enquirer correctly notes, "R.C. 2151.356 cannot overcome the constitutional right of access afforded under the Open Courts provision." Ultimately, "[t]he Constitution is the supreme law; it is the expression of the will of the people, subject to amendment only by the people, and neither the Legislature by legislative enactment, nor the courts by judicial interpretation, can repeal or modify such expression or destroy the plain language and meaning of the Constitution, otherwise there would be no purpose in having a Constitution." *Hoffman v. Knollman*, 135 Ohio St. 170, 181 (1939).

**{¶ 47}** In any event, the dissent misreads our prior jurisprudence. The idea that a juvenile record could be automatically sealed without an individualized determination is a novel one in our centuries-long history. Before the passage of R.C. 2151.356, *see* Am.Sub.H.B. No. 137, 151 Ohio Laws, Part IV, 7622 (effective Aug. 3, 2006), juveniles could apply to have their records sealed under certain circumstances provided that the court had discretion to order the records sealed. *See* Am.Sub.H.B. No. 320, 133 Ohio Laws 2040, Part II, 2066-2067 (effective Nov. 19, 1969). And for the first 65 years of Ohio's juvenile court system, there was no sealing mechanism whatsoever. R.C. 2151.356 is different in character from earlier statutes restricting public access. It *requires* the court to forever seal a record without any opportunity for judicial review or any individualized balancing of the interests at stake. In short, it is a blanket courtroom-closure order, bereft of any of the protections that have traditionally been afforded before the entry of such orders.

**{¶ 48}** We are not alone in holding that our Constitution protects public access to court proceedings that extends further than the United States Supreme Court's interpretation of the free speech and press guarantees of the federal Constitution. The Oregon Constitution contains a similar open courts guarantee to Ohio's, providing that "[n]o court shall be secret, but justice shall be administered, openly and without purchase," Oregon Const., art. I, § 10. The Oregon Supreme Court has held that this provision "does not recognize distinctions between various kinds of judicial proceedings; it applies to all." *State ex rel. Oregonian Pub. Co. v. Deiz*, 289 Or. 277, 283 (1980). And it has applied this provision to require public and press access to juvenile proceedings notwithstanding a state statute that authorized a judge to exclude the public. *Id.*

**{¶ 49}** In a concurring opinion in *Deiz*, Justice Linde explained:

> In modern times the impression probably has become widespread that a question of constitutional law is not settled until

the United States Supreme Court settles it, and that it cannot be settled differently from that Court's decision. That is half true. It is true only when a state denies someone a right guaranteed by the United States Constitution. It is not true when a state's constitution provides more or stronger guarantees than the national minimum. This is such a case.

*Id.* at 286 (Linde, J., concurring). Ours is also such a case.

*D. Because the Open Courts Provision Applies to Juvenile Delinquency Proceedings, Records Cannot Be Sealed Without Individualized Findings*

**{¶ 50}** Having determined that the open courts provision applies to juvenile delinquency proceedings, the rest of the analysis is straightforward. We have consistently held that when there is a constitutional right of access, proceedings may only be closed based on individualized findings "that closure was essential to protect an overriding interest, that the closure was drawn as narrowly as possible to protect only that overriding interest, or that no viable alternatives to closure were available." *Unger*, 28 Ohio St.3d at 422. We have applied this test in the context of access to court records involving juveniles. *State ex rel. Cincinnati Post v. Second Dist. Court of Appeals*, 65 Ohio St.3d 378 (1992).

**{¶ 51}** We have made clear that this requirement applies to court records. In *Cincinnati Post*, we granted a writ of mandamus to a newspaper seeking to gather information on the outcome of appeals brought under the statute permitting judicial bypass of parental notification for a minor to procure an abortion. Those files were sealed, but the court noted that "[a]s a general principle courts should be open, and the public should have access to the proceedings. Indeed this is a requirement of the Ohio Constitution." *Id.* at 381, citing Ohio Const., art. I, § 16.

**{¶ 52}** The *Cincinnati Post* court further noted that court proceedings may be closed "only when there is an overriding competing interest," and that any

24

"restriction should be narrowly tailored to serve the competing interest without unduly burdening the public's right of access." *Id.*, citing *T.R.*, 52 Ohio St.3d 6. The court explained that the United States Supreme Court had mandated that as a constitutional matter, an abortion parental-consent law must contain a judicial-bypass procedure that maintains the juvenile's anonymity. *Id.* at 379. But under the open courts provision, the public was entitled to access court records that did not compromise the juvenile's anonymity, specifically: "(1) the docket number, (2) the name of the judge, and (3) the decision including, if appropriate, a properly redacted opinion." *Id.* at 381.

{¶ 53} In *Winkler*, we dealt with a statute that allowed a defendant who had been found not guilty of an offense to apply to have the record of that proceeding sealed. We explained that the constitutional presumption of openness applied to the records at issue. 2004-Ohio-1581 at ¶ 8. But we upheld the constitutionality of the statute based on its requirement that the trial judge conduct an individualized balancing of the public's right of access against the acquitted defendant's interest in privacy. We explained:

> The statute . . . requires that following a hearing, the court must '[w]eigh the interests of the person in having the official records pertaining to the case sealed against the legitimate needs, if any, of the government to maintain those records.' R.C. 2953.52(B)(2)(d). Thus, the court's discretion to seal records is not unfettered. Instead, the statute balances the public's right of access and the acquitted defendant's constitutional right to privacy.

*Id.* at ¶ 10.

{¶ 54} The statute at issue in this case does not contain the feature that allowed us to uphold the constitutionality of the statute in *Winkler*. R.C.

25

2151.356(B)(1)(d) does not require any individualized balancing of interests—and Judge Bloom did not conduct any such balancing.

{¶ 55} We therefore grant the Enquirer the writ of mandamus that it seeks. In another case, it might be appropriate to remand for a juvenile court judge to conduct the balancing in the first instance. But in this case, J.L. is deceased and thus can no longer assert an interest in shrouding the proceedings from the public.[9]

{¶ 56} Granting the writ in this case is required by the constitutional text. But it bears mentioning that doing so comports with the values underlying that text.[10] The open courts provision is premised on the notion that "the people have the right to know what is being done in their courts." *State v. Hensley*, 75 Ohio St. 255, 266 (1906). After all, "[t]he courts belong to the people" and "[i]f we deny to the public and press access to courts of justice, we foster a system of jurisprudence heretofore unknown in the history of Ohio." *Fulton*, 100 Ohio App. at 177-178 (Hurd, J., concurring).

{¶ 57} We recognize that there are strong interests in protecting the privacy of juveniles—particularly when a juvenile has been judged not to be delinquent. But there are also countervailing interests in ensuring that juvenile proceedings are subject to public scrutiny. *See* Clark, *Collateral Damage: How Closing Juvenile Delinquency Proceedings Flouts the Constitution and Fails to Benefit the Child*, 46 U.Louisville L.Rev. 199 (2007); Note, *The Public Right of Access to Juvenile Delinquency Hearings*, 81 Mich.L.Rev. 1540 (1983). These interests include

9. The dissent criticizes us for granting the writ "without consideration of whether names of witnesses, victims, or family members might warrant protection," dissenting opinion at ¶ 127. But we have long recognized that the interests to be balanced in making such a decision are those of the juvenile and the public. *See, e.g.*, *T.R.*, 52 Ohio St.3d at 16; *State ex rel. Dispatch Printing Co. v. Lias*, 1994-Ohio-335, ¶ 26; *Geauga*, 2000-Ohio-35, at ¶ 41; *Winkler*, 2004-Ohio-1581, at ¶ 11.

10. The dissent claims this passage "suggest[s] a new interpretive principle" to be abused for judicial-policymaking ends. Dissenting opinion at ¶ 113. But we do not rely on the values underlying the text to find the statute unconstitutional. Rather, we rely on the text and history of the open courts provision to find the statute unconstitutional and simply note that this conclusion is also supported by the principles underlying the provision's text.

"educating society about the juvenile court, promoting public confidence in the judicial branch, deterring future acts of delinquency, deterring abuse of power by judges and other public officials, and alerting parents to their responsibilities regarding their minor children." *State ex rel. Plain Dealer Publishing Co. v. Floyd*, 2006-Ohio-4437, ¶ 35. Indeed, history is rife with examples of abuse of juveniles in our justice system—abuse that was often perpetuated by closing our juvenile system from public scrutiny.[11]

{¶ 58} This court has recognized the importance of public access to and scrutiny of our juvenile court system. We have made clear that ""[t]he public has a right to know how courts deal with children and families."' " *Geauga*, 2000-Ohio-35, at ¶ 24, quoting Dienes, Levine & Lind, *Newsgathering and the Law* 139 (2d Ed.1999), fn. 443, quoting National Council of Juvenile & Family Court Judges, *Children and Family First: A Mandate for America's Courts* 3 (1995). And we have explained that "[a]llowing the public . . . into our courtrooms will enable society as a whole to become better acquainted with the functioning of the judicial process and the laws enacted by the General Assembly that directly impact our minor children." *State ex rel. Dispatch Printing Co. v. Lias*, 1994-Ohio-335, ¶ 26.

{¶ 59} But transparency and openness are not just policy values: in Ohio they are a constitutional requirement. *See Cincinnati Post*, 65 Ohio St.3d at 381.

---

11. *See, e.g.*, Rubinkam, *Pa. Judge Guilty of Racketeering in Kickback Case* (Feb. 19, 2011), https://apnews.com/article/pennsylvania-racketeering-scranton-863f02b89f824c0296cdbbcf8a539bbf (accessed Mar. 19, 2024) [https://perma.cc/EFS8-8SPL]; Knight, *Black Children Were Jailed for a Crime That Doesn't Exist. Almost Nothing Happened to the Adults in Charge* (Oct. 8, 2021), https://www.propublica.org/article/black-children-were-jailed-for-a-crime-that-doesnt-exist (accessed Mar. 19, 2024) [https://perma.cc/Q6XB-YNJA]; Satija, *Harris County juvenile judges and private attorneys accused of cronyism: "Everybody wins but the kids"* (Nov. 1, 2018), https://www.texastribune.org/2018/11/01/harris-county-texas-juvenile-judges-private-attorneys/ (accessed Mar. 19, 2024) [https://perma.cc/XKQ5-255Q]; Montgomery & Moore, *They Went to the Dozier School for Boys Damaged. They Came Out Destroyed* (Aug. 18, 2019), https://www.tampabay.com/investigations/2019/08/18/they-went-to-the-dozier-school-for-boys-damaged-they-came-out-destroyed/ (accessed July 8, 2024) [https://perma.cc/T6R5-KWEE]; *see also* Whitehead, *The Nickel Boys* (2019), for a fictionalized account of the abuses detailed in the above-referenced source.

In adopting the open courts provision, the voters who enacted our Constitution made the decision that the administration of justice is best done in the open. We are obligated to honor their decision by holding true to the text of our Constitution.

## III. CONCLUSION

{¶ 60} We hold that the open courts provision of the Ohio Constitution requires, at a minimum, that a juvenile delinquency proceeding cannot be closed to the public without an individualized determination balancing the interests at stake. We therefore find that under the open courts provision, R.C. 2151.356 may not be constitutionally applied without such an individualized determination. And because J.L. no longer has an interest in keeping the transcript of his delinquency trial secret, we grant a writ of mandamus ordering that Judge Bloom produce a copy of the trial transcript to the Enquirer and a writ of prohibition precluding her from enforcing her order sealing the records.

Writs granted.

_____

**DONNELLY, J., concurring in judgment only.**

{¶ 61} Based on the facts presented when this action was filed, we should prohibit respondent, Judge Kari L. Bloom, from continuing to enforce her decision to seal the records of certain juvenile-court proceedings against J.L., and we should order that the transcript of those proceedings be provided to relator, the Cincinnati Enquirer.[12] Because the majority eventually gets to the right disposition, albeit through an analysis that no one asked for and with legal conclusions that are both erroneous and far broader than necessary for the disposition, I concur in judgment only.

---

12. To the extent that certain procedures may be required at the juvenile-court level prior to unsealing, such as the redaction of names of juveniles other than J.L. from the record, we should remand this matter to the juvenile court with instructions that the court undertake such actions before unsealing the record.

## I. ANALYSIS

{¶ 62} First, let's look at the analysis that was actually requested. In its brief, the Cincinnati Enquirer points to the first provision in Article I, Section 16 of the Ohio Constitution, which states that "[a]ll courts shall be open." The Cincinnati Enquirer asks us to declare R.C. 2151.356(B)(1)(d) to be unconstitutional because it lacks any mechanism to allow a court to consider the public's interest in having access to juvenile records, such as the balancing test that we employed in *State ex rel. Scripps Howard Broadcasting Co. v. Cuyahoga Cty. Court of Common Pleas, Juvenile Div.*, 73 Ohio St.3d 19 (1995)—a case in which we applied the balancing test from *In re T.R.*, 52 Ohio St.3d 6, 12 (1990). *See Scripps* at 21.

### A. *Scripps*

{¶ 63} The controversy in *Scripps* involved the application of Juv.R. 37(B), which provides that "[n]o public use shall be made by any person, including a party, of any juvenile court record, including the recording or a transcript of any juvenile court hearing, except in the course of an appeal or as authorized by order of the court." By its plain language, Juv.R. 37(B) does not require a trial judge to consider any particular factors, perform any balancing of interests, or provide any reasoning when declining to authorize the public release of a juvenile-court record. Based on Juv.R. 37(B), the juvenile-court judge in *Scripps* summarily denied public access to a transcript of contempt proceedings in a custody matter. *Scripps* at 20.

{¶ 64} In *Scripps*, this court held that juvenile-court proceedings have historically been closed to the public and therefore the constitutional presumption of openness was not applicable. *Scripps* at 21. However, Ohio's open-courts provision and the First Amendment to the United States Constitution require that "'any restriction shielding [juvenile] court proceedings from public scrutiny should be *narrowly tailored* to serve the competing interests of protecting the welfare of the child or children and of not unduly burdening the public's right of access.'" (Emphasis in original.) *Id.*, quoting *State ex rel. Dispatch Printing Co. v. Lias*,

1994-Ohio-335, ¶ 23, discussing *T.R.* We held that the juvenile-court judge's order under Juv.R. 37(B) summarily denying a request for public access to a transcript "impinged on the public's constitutional right of access." *Scripps* at 21. Thus, notwithstanding the language of Juv.R. 37(B), we held that a juvenile-court judge must make the following findings before denying public release of a transcript: "(1) that there exists a reasonable and substantial basis for believing that public access could harm the child or endanger the fairness of the adjudication, and (2) that the potential for harm outweighs the benefits of public access." *Scripps* at 20-21, citing *T.R.* at paragraph three of the syllabus.

{¶ 65} The foregoing balancing test was borrowed from our holding in *T.R.*, a case in which we applied the test to former R.C. 2151.35 and former Juv.R. 27, both of which similarly lacked any standards for closing juvenile-court proceedings. *T.R.*, 52 Ohio St.3d at 17-18; *see* former R.C. 2151.35(A), 1988 Am.Sub.S.B. No. 89, 142 Ohio Laws, Part I, 198, 221 ("In the hearing of any case, the general public may be excluded and only those persons admitted who have a direct interest in the case."); former Juv.R. 27(A), 69 Ohio St.3d CLXIX ("In the hearing of any case the general public may be excluded and only persons admitted who have a direct interest in the case.").[13] This balancing test, which is less stringent than the standard generally applicable to adult-court proceedings, requires that juvenile-court proceedings be closed only when the judge has made "findings that closure is essential to preserve higher values and is narrowly tailored to serve an overriding interest." *Scripps*, 73 Ohio St.3d at 20, citing *Press-Enterprise Co. v. Superior Court of California for Riverside Cty.*, 478 U.S. 1, 9 (1986) ("*Press-Enterprise II*").

---

13. Subsequent to this court's decision in *T.R.*, both R.C. 2151.35 and Juv.R. 27 were amended to incorporate the balancing test articulated in *T.R.* *See* Am.Sub.S.B. No. 179, 148 Ohio Laws, Part IV, 9447, 9515; 2001 Staff Notes to Juv.R. 27(A), 92 Ohio St.3d CVIII.

**{¶ 66}** At issue in *Scripps* was a request for a transcript that was limited to contempt proceedings brought against nonparties to the underlying custody dispute for their failure to timely produce subpoenaed records. *Scripps* at 19. Because there was no indication that the parties to the custody proceeding would be harmed by public access to the collateral contempt proceedings, let alone harm that would outweigh the benefits of public access, we simply ordered disclosure of the transcript, rather than ordering the juvenile court to conduct its own weighing of interests. *Id.* at 22.

**{¶ 67}** *Scripps* stands for the proposition that juvenile-court proceedings are not subject to the same presumption of openness contemplated in the open-courts provision that applies to adult-court proceedings. *See Scripps* at 20. But juvenile-court proceedings are also not conclusively presumed to be closed; a less stringent standard does not mean *no* standard. *See id.* at 21, quoting *Lias*, 1994-Ohio-335, at ¶ 23 ("even under the *T.R.* standard, we have stated that 'any restriction shielding court proceedings from public scrutiny should be *narrowly tailored* to serve the competing interests of protecting the welfare of the child or children and of not unduly burdening the public's right of access' " [emphasis in original]). And when the justification for the confidentiality of juvenile-court proceedings—e.g., protecting sensitive information about children—becomes inapplicable, the failure to provide the narrower cloak of confidentiality presents an undue burden on the public's right of access. *See Scripps* at 21-22.

### B. The statutory scheme is unconstitutional under *Scripps*

**{¶ 68}** Let's apply our analysis in *Scripps* to this case. Subject to exceptions not applicable here, R.C. 2151.357(A) prohibits a juvenile-court judge from entertaining a request for the release of juvenile-court records that were sealed under R.C. 2151.356, including a juvenile's records that were required to be immediately sealed when the juvenile was found to be not delinquent, R.C. 2151.356(B)(1)(d). The statutory scheme creates an impenetrable rule regarding

juveniles found to be not delinquent. It provides no possibility for public access under any circumstances, either at the time the record is initially closed off from public access or at the time of a later request to release the record.

{¶ 69} Even presumptively closed grand-jury proceedings are subject to exceptions when closure conflicts with other constitutional protections. *See State v. Laskey*, 21 Ohio St.2d 187, 191 (1970), *vacated in part on other grounds, Laskey v. Ohio*, 408 U.S. 936 (1972) (allowing disclosure of grand-jury proceedings only if "the ends of justice require it," which can be established by demonstrating "a particularized need" that "outweighs the policy of secrecy"); *In re Petition for Disclosure of Evidence Presented to Franklin Cty. Grand Juries in 1970*, 63 Ohio St.2d 212, 215-216 (1980) (applying *Laskey* to a request for grand-jury records by a civil litigant who was not a defendant in the underlying criminal prosecution); *see also Butterworth v. Smith*, 494 U.S. 624, 630 (1990), quoting *United States v. Dionisio,* 410 U.S. 1, 11 (1973) ("the invocation of grand jury interests is not 'some talisman that dissolves all constitutional protections' "). Accordingly, because the confidentiality required in R.C. 2151.356(B)(1)(d) and 2151.357(A) is conclusive and provides no relevant exception to public access, the statutory scheme impinges on "the public's constitutional right of access," *Scripps*, 73 Ohio St.3d at 21.

## C. We cannot fix the statutory scheme on the General Assembly's behalf

{¶ 70} While we had the freedom in *T.R.* and *Scripps* to add a weighing requirement to the open-ended language in Juv.R. 27 and 37 and R.C. 2151.35 to cure the potential for an undue burden on the public's constitutional right of access, we don't have that same freedom in this case with R.C. 2151.356(B)(1)(d) and 2151.357(A). The statutory scheme's mandatory language provides no room for discretion and therefore no room to add a balancing test. We also cannot summarily impose the weighing requirement from *Scripps* and *T.R.* to the statutory scheme, because we would risk exceeding our judicial role of identifying the constitutional floor below which a law may not fall and risk otherwise intruding into the

legislative function. *See Fortner v. Thomas*, 22 Ohio St.2d 13, 14 (1970) (the judiciary must not make "premature declarations or advice upon potential controversies . . . includ[ing] enactments of the General Assembly"). We created the weighing test in *Scripps* and *T.R.* to ensure that the process of closing juvenile-court proceedings remained above the floor of what might minimally be constitutionally required. We acknowledged in *T.R.* that the actual floor might be lower and hypothesized in dicta that a statutory presumption of closed juvenile-court proceedings might pass constitutional muster. *T.R.*, 52 Ohio St.3d at 17.

{¶ 71} I have my doubts whether our hypothesis in *T.R.* was correct, but regardless, dicta has no precedential value. *See Cosgrove v. Williamsburg of Cincinnati Mgt. Co.*, 1994-Ohio-295, ¶ 16 (dicta "has no binding effect"). Moreover, we have already held that such a presumption cannot apply in the context of juvenile-delinquency proceedings. *See State ex rel. Plain Dealer Publishing Co. v. Geauga Cty. Court of Common Pleas, Juv. Div.*, 2000-Ohio-35, ¶ 22. And even if the dicta in *T.R.* were correct *and* applicable to juvenile-delinquency proceedings, we still may not give our blessing to R.C. 2151.356(B)(1)(d) and 2151.357(A), because public access is not just presumptively closed under the statutory scheme, public access is *conclusively* closed. Regardless of where the constitutional floor might be for public access to juvenile-court proceedings, R.C. 2151.356(B)(1)(d) and 2151.357(A) clearly fall below that floor. Thus, even without declaring a new weighing test to cure the unconstitutional nature of the statutory scheme on behalf of the General Assembly for future cases, we must still declare the statutory scheme to be unconstitutional as requested in the Cincinnati Enquirer's complaint.

**D. The writs should issue under *Scripps***

{¶ 72} Although we should neither rewrite nor approve of the statutory scheme in accordance with our holdings in *Scripps* and *T.R.*, we must still grant the Cincinnati Enquirer's requested relief on the authority of those cases. Given the circumstances at the time the Cincinnati Enquirer filed its complaints for writs of

mandamus and prohibition, Judge Bloom's refusal to release the transcript of J.L.'s juvenile-court proceedings unduly burdens the public's right of access under any standard. The confidentiality of juvenile-court proceedings is justified by the policy of promoting the long-term rehabilitation of juveniles so that they may enter society as adults who have been protected and nurtured as youths and so that they are not permanently stigmatized by their youthful mistakes. *See* R.C. 2151.01; Juv.R. 1(B)(3); *T.R.* at 16, quoting *In re Gault*, 387 U.S. 1, 24 (1967); *In re C.P.*, 2012-Ohio-1446, ¶ 63 ("Ohio's juvenile system is designed to shield children from stigmatization based upon the bad acts of their youth . . . ."). It is undisputed that J.L. was deceased when the Cincinnati Enquirer requested the transcript of his juvenile-court proceedings from early 2022. It goes without saying that the loss of a young life is tragic. But it remains true that there is no need to protect the future of a life that has been cut short. Accordingly, the justification for the confidentiality of juvenile-delinquency records for the sake of protecting the juvenile's future is not applicable here. Because there is no potential harm to J.L. or to the fairness of his proceedings, let alone harm that would outweigh the benefits of public access, the transcript should be disclosed. Thus, under the specific facts of this case, the writs of mandamus and prohibition requested by the Cincinnati Enquirer must issue.

## II. THE MAJORITY'S IMPROPER ANALYSIS

{¶ 73} In contrast to the straightforward analysis above, the majority's analysis reminds me of a scene from the rock-band mockumentary, *This is Spinal Tap* (Embassy Pictures Corp. 1984). In the scene, Spinal Tap's lead guitarist, Nigel Tufnel, brags to an interviewer that his band's sound system is more powerful than others' because the knobs on his band's amplifiers go up to 11 rather than the standard 10. When pressed about whether there was any actual difference in the amplifiers other than the numbers, he goes in circles with the interviewer and then simply concludes, "These go to 11." The majority thinks the open-courts provision

of the Ohio Constitution clearly goes to 11, but the majority offers no coherent argument about what that actually means. One might think that the majority is making more than a Nigel Tufnel argument given its copious references to storied documents like the Magna Carta and other precursors to the origin of our glorious State, but the majority fails to make the requisite connections between its lofty, generic references and the specific conclusions it draws.

{¶ 74} The majority also fails to make connections between the controversy presented by the parties and the issues that the majority claims it needs to resolve. The majority does a lot of reframing to get where it wants to go. The majority reframes Judge Bloom's argument as centering on the meaning and import of *T.R.*, despite the fact that Judge Bloom does not cite *T.R.* at any point, let alone discuss it.[14] It reframes *T.R.* as destroying the public's right to access juvenile-court proceedings, despite the fact that *T.R.* created a weighing test to ensure that juvenile-court proceedings could not be closed without first considering the public's constitutional right to access. It reframes the question before us as whether we should "adhere to *T.R.*'s holding simply on the basis of stare decisis," majority opinion, ¶ 26, or overrule *T.R.* despite precisely no one asking that question. It reframes this court's reliance on federal jurisprudence in *T.R.* as a historical aberration that requires us to overrule *T.R.*, despite the fact that the majority touts other precedent from this court that relies on the very same federal jurisprudence. It reframes the test of "experience and logic" from *Press-Enterprise II* as wholly unique to the First Amendment, despite the fact that we have applied the same or similar tests in other areas of Ohio law. And although it finds historical considerations to be irrelevant, the majority goes ahead and reframes our history of

---

14. To the extent that Judge Bloom provided any constitutional argument at all, she merely claimed that the Cincinnati Enquirer could not rely on *Scripps*, because it related to family law rather than a juvenile-justice case. It is the Cincinnati Enquirer that first mentioned *T.R.* in its reply brief to support its argument that the right to public access is even stronger in the context of juvenile-justice cases.

imposing *adult*-court-criminal proceedings on juveniles as the history of juvenile courts themselves, despite the fact that juvenile-court proceedings are unique from adult-court proceedings and include everything from custody disputes to delinquency adjudications.

{¶ 75} And what is the majority's intended destination with all of this reframing? Certainly not the result of granting the writs as requested—the writs can be granted by applying rather than overruling *T.R.* and *Geauga*. Rather, the majority's goal is apparently to have the chance to hold forth about the evils of "lockstepping" and the need for independent state constitutional analysis, also known as judicial federalism. *See* Bergeron, *A Tipping Point in Ohio: The Primacy Model as a Path to a Consistent Application of Judicial Federalism*, 90 U.Cin.L.Rev. 1061, 1062 (2022). While I think some of the majority's generic points are good ones, the majority's decision to unnecessarily force those points onto this case is a bad one. The result is the gratuitous and selective overruling of precedent that creates a new rule that is applicable to all juvenile-court proceedings far beyond the scope of this controversy, which is contrary to our obligation to exercise judicial restraint.

### A. Misinterpretation of *T.R.*

{¶ 76} The majority creates an inroad to its analysis by claiming that we held in *T.R.* that the public has no constitutional right of access whatsoever to juvenile-court proceedings. This claim is founded on a materially incomplete reading of *T.R.*

{¶ 77} The litigation underlying *T.R.* involved a custody battle that garnered national attention, in response to which some parties moved to close proceedings and seal the record. *See T.R.*, 52 Ohio St.3d at 8-9. The applicable rule, Juv.R. 27, and statute, R.C. 2151.35(A), both provided that "the general public may be excluded," *T.R.* at 17, essentially leaving the decision whether to close to the juvenile court's broad discretion. The juvenile-court judge granted the motion for

closure, first stating that closure was warranted "'[s]o long as there is a scintilla of possibility of harm to the child,' " but later indicating in his judgment entry that the proper standard included "'a presumption in favor of the openness of all judicial proceedings' which could only be overcome 'where a competing, overriding interest is found to exist and the preservation of that overriding interest necessitates invasion of the first amendment rights.' " *Id.* at 11. The latter standard articulated by the juvenile court is the strict standard that applies to adult-court proceedings and the former standard is incredibly lax, while the rule and statute provided no standard at all.

{¶ 78} This court began the analysis of the foregoing competing standards (and nonstandards) with the holding now criticized by the majority—that "juvenile court proceedings have historically been closed to the public," *id.* at 15, and that the presumption of public access does not apply, *id.* at 17. But this did not end the analysis. This court stressed that although the public's constitutional right to access juvenile-court proceedings was not strong enough to require a presumption of openness, the public's right was nonetheless significant and that it must be adequately weighed by the juvenile court before restricting access. *Id.* at 16-17. This court rejected standards that focused on the "'scintilla of possibility of harm' " or the "'best interests of the child' " because those standards did not adequately protect the "public's interest in access." *Id.* at 18. To protect the public's lesser-but-still-significant constitutional right to access juvenile-court proceedings, this court decided to require juvenile courts to make findings "(1) that there exists a reasonable and substantial basis for believing that public access could harm the child or endanger the fairness of the adjudication, and (2) that the potential for harm outweighs the benefits of public access." *Id.* at 18-19.

{¶ 79} The majority incorrectly claims that this court created the foregoing standard by "turn[ing] to statutory law and rules," majority opinion at ¶ 12. Not so. To the contrary, this court added the standard—which was completely absent from

the statute and rule—to protect the public's constitutional interests.[15]  Normally we are forbidden from adding to the language of a statute, but ambiguous statutory language does give us some ability to reframe the language to preserve the statute's constitutionality.  *See State v. Jeffries*, 2020-Ohio-1539, ¶ 18, 27.  Given the neutrality of the language in the version of R.C. 2151.35(A) in effect at the time of *T.R.*, we apparently felt empowered to ask for forgiveness rather than permission in imposing our own test to avoid potential violations of the public's right to access juvenile-court proceedings.  Our dicta regarding the possible constitutionality of a hypothetical statute with a presumption of closure of juvenile-court proceedings, *T.R.* at 17, was essentially our request for forgiveness; the General Assembly was free to add a different statutory standard for juvenile-court proceedings, the constitutionality of which we could scrutinize at a later point.

{¶ 80} Although this court held in *T.R.* that juvenile-court proceedings do not carry the same mandatory presumption of openness applicable to adult-court-criminal proceedings, *T.R.*, 52 Ohio St.3d at 21, we did not turn the First Amendment or Ohio's open-courts provision into an all-or-nothing dichotomy and conclude, as the majority claims, that the public has no right whatsoever to access juvenile-court proceedings.  We held that the public's interest in access to juvenile-court proceedings must be weighed against any interest in closing juvenile-custody and dependency proceedings, and we also held that the public's interest is owed even more weight in juvenile-delinquency proceedings.  *T.R.* at 16; *see also Geauga*, 2000-Ohio-35, at ¶ 22-23.  If it were true that the public had no constitutional right to open proceedings to be weighed, there would have been no

---

15. To support its contention that the balancing test in *T.R.* had a statutory rather than constitutional source, the majority cites *State ex rel. Plain Dealer Publishing Co. v. Floyd*, 2006-Ohio-4437, ¶ 34, which references the balancing test as "required by precedent, statute, and rule."  The majority fails to acknowledge that by the time *Floyd* was decided, the statute and rule had been amended to adopt the standard created in *T.R.  See Floyd* at ¶ 33.  Thus, the standard reflected in the statute and the rule came from our constitutionally derived precedent, not the other way around.

reason to create a balancing test. And although this court suggested in *T.R.* that a statutory presumption of closure might be constitutional in custody and dependency proceedings, we never suggested that conclusively closed juvenile-court proceedings would be constitutional.

## B. Misunderstanding of *T.R.*'s Place in History

{¶ 81} The majority compounds its misinterpretation of our holding in *T.R.* by misinterpreting its historical context. In order to justify overruling *T.R.*, the majority describes *T.R.* as a sudden departure from how we have "[h]istorically" and "traditionally" held that "court proceedings are presumptively open" in cases such as *State ex rel. The Repository v. Unger*, 28 Ohio St.3d 418 (1986); *Scripps*, 73 Ohio St.3d 19; and *State ex rel. Cincinnati Enquirer v. Winkler*, 2004-Ohio-1581, *superseded by statute on other grounds as stated in In re Disqualification of Celebrezze*, 2023-Ohio-4383. Majority opinion at ¶ 7. In the majority's version of history, the "presumption of openness" was held to always apply under the open-courts provision until *T.R.* injected a new exception based on federal jurisprudence—particularly *Press-Enterprise II*, 478 U.S. 1—regarding the Free Speech and Free Press Clauses of the First Amendment. *See* majority opinion at ¶ 9, 41. The majority fails to acknowledge that this court's use of the "presumption of openness" standard came from the same line of federal jurisprudence, including *Press-Enterprise II*. *See Unger* at 421; *Scripps* at 20; *T.R.*, 52 Ohio St.3d at 12; *Winkler* at ¶ 8.

### 1. Federal jurisprudence in context

{¶ 82} The United States Supreme Court's decision in *Press-Enterprise II* arose out of a shift in discourse about the openness of court proceedings in the 1980s from demands by the press to access and report on significant aspects of the criminal-justice system. Through the end of the 1970s, the constitutional right to open proceedings was discussed as a right belonging to the litigants, whereas public access to court proceedings was viewed as a right derived from the common law

and subject to limitation at a trial court's discretion. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597-599 (1978); *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 385 (1979). The American public's ability to access court records and transcripts was viewed as rather liberal compared to the traditional English practice of allowing access only with proof of a proprietary interest in the records or a specific need to use them in litigation. *Nixon* at 597. Although there was a recognized right for the public to attend civil and criminal trials, the right was not viewed as extending to anything before or after the trials, nor to any proceedings that did not exist at common law. *Gannett* at 387-388 and fns. 17 through 19.

{¶ 83} The United States Supreme Court first recognized that the public's interest in attending trials is a constitutional right in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), and *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596 (1982). In *Richmond*, the Court emphasized the historical presumption of openness of trials to support the conclusion that the presumption of openness was baked into the United States Constitution and essential to the administration of justice as well as the public's faith in the judicial system. *Richmond* at 569-571. In *Globe*, the Court focused on the importance of public access to trial proceedings as significant to "the functioning of the judicial process and the government as a whole." *Globe* at 606. The Court struck down a state law requiring the closure of trial proceedings for sex offenses during the testimony of a minor victim, notwithstanding the argument that the public had historically been excluded from such proceedings. *Id.* at 605, fn. 13. The Court further reasoned that "logic and common sense" did not support the claim that closure was necessary to encourage minors to feel safe in providing accurate testimony, given that the same rationale could be applied to any reluctant testifier and given that the law did not otherwise protect the minor's identity or restrict subsequent access to transcripts of the same proceedings. *Id.* at 609-610. The "tests

of experience and logic," *Press-Enterprise II* at 9, are thus based on the historical and pragmatic concerns discussed in *Richmond* and *Globe*.

**{¶ 84}** The conclusions in *Richmond* and *Globe* were not a huge stretch given that trials "'had long been presumptively open' " under the common law of England and early American law. *Globe* at 605, quoting *Richmond* at 569. But in light of the Court's previous indications in *Gannett* and *Nixon* that the public's historical right to access court proceedings extended no further than a traditional criminal or civil trial, it was more of a stretch for the Court to extend *Richmond* and *Globe* to voir dire proceedings in *Press-Enterprise Co. v. Superior Court of California, Riverside Cty.*, 464 U.S. 501 (1984) ("*Press-Enterprise I*"), and to preliminary hearings in *Press-Enterprise II*. Although the Court maintained that the historical openness of a particular proceeding was still relevant to a determination whether the public had a First Amendment right to access, *Press-Enterprise II*, 478 U.S. at 8-9, the Court focused heavily on the logical connection between openness of a pretrial hearing and the fairness of and public confidence in the outcome, *id.* at 12-13.[16]

### 2. Ohio's use of federal jurisprudence in context

**{¶ 85}** The history of this court's application of the open-courts provision to public access prior to *Press-Enterprise II* is sparce, which explains why the majority so heavily relies on a single concurring opinion from the Eighth District Court of Appeals: *E.W. Scripps Co. v. Fulton*, 100 Ohio App. 157, 170-178 (8th Dist. 1955) (Hurd, J., concurring). This court first identified the public's constitutional right to access proceedings and a "presumption of openness" in *Unger*, in which we quoted *Press-Enterprise I* and concluded that the constitutional

---

16. Despite their initial emphasis on juvenile-court proceedings being historically closed, our decisions in *T.R.* and *Geauga* seem to share the focus of *Globe* and *Press-Enterprise II* on the logic and fairness of open proceedings, given that the decisions ultimately required that the public's interest in accessing the proceedings be weighed against the interest in closure. *See T.R.*, 52 Ohio St.3d at 18-19; *Geauga*, 2000-Ohio-35, at ¶ 29.

right of access applied to pretrial proceedings in accordance with *Press-Enterprise II*. *Unger*, 28 Ohio St.3d at 421 and fn. 4. The second instance was in *T.R.*

{¶ 86} The majority fails to cite a single case prior to our decision in *T.R.* that held that juvenile-court proceedings must presumptively be open to the public under the open-courts provision. My review of our jurisprudence has only revealed decisions that make passing references to the view that juvenile-court proceedings have been considered nonpublic and confidential. *See, e.g.*, *Prescott v. State*, 19 Ohio St. 184, 187-188 (1869) (describing Ohio's juvenile-court proceedings as "purely statutory" and not subject to the constitutional rights that apply to criminal trials); *Ex parte Januszewski*, 196 F. 123, 129 (C.C.Ohio 1911); *In re Agler*, 19 Ohio St.2d 70, 73 (1969) (describing Ohio's juvenile-court hearings and records as "non-public."); *see also id.* at 81 ("the privacy of juvenile proceedings in themselves offers protection to a child from the adverse effect of groundless charges upon his reputation"); *Unger* at 425 (Celebrezze, C.J., concurring) (mentioning "certain juvenile hearings" as an example of proceedings that "do not come within the realm of the constitutional guarantee of open courts"); *State v. Hanning*, 2000-Ohio-436, ¶ 15 ("traditionally juveniles have been shielded from the stigma of the proceedings by keeping hearings private and not publishing juveniles' names"); *C.P.*, 2012-Ohio-1446, at ¶ 62 ("Confidentiality has always been at the heart of the juvenile justice system.").

{¶ 87} To the extent that our decision in *T.R.* departs from our so-called traditional view of the public's right to access juvenile-court proceedings, it appears to have expanded rather than restricted that right by requiring trial courts to weigh the public's interest in accessing juvenile-court proceedings against the interest in closure or confidentiality. If there are better examples of the intersection between the open-courts provision and juvenile-court proceedings in Ohio history, neither the majority nor I have found them. Of course, the Cincinnati Enquirer or Judge Bloom might have provided us with a fuller historical picture if one of them, rather

than the majority, had raised the issue of *T.R.*'s continuing validity or the history of juvenile-court proceedings in Ohio.

### C. Bald conclusions and irrelevant history

{¶ 88} The majority sua sponte overturns *T.R.* and *Geauga* after spending a great deal of time discussing lockstepping, judicial federalism, and the need to independently interpret the Ohio Constitution. But after all this buildup, the majority makes very little effort to undertake an independent interpretation of the open-courts provision as it applies to juvenile-court proceedings.

{¶ 89} The majority takes pains to explain that there are three provisions in Article I, Section 16 of the Ohio Constitution, that each of the three provisions has an independent meaning (even though no one argues that the three provisions are one and the same), and that the open-courts provision protects the public's right to access and not just the individual rights of the litigants themselves (again, no one argues otherwise). The majority then declares that its discussion of these irrelevant, undisputed aspects of Article I, Section 16 constitutes an "independent interpretation" of Ohio's open-courts provision, majority opinion at ¶ 39, and somehow supports the conclusion that juvenile-court proceedings require the same presumption of openness that applies to adult-court proceedings. The majority also declares that the meaning of the words "[a]ll courts shall be open," Ohio Const., art. I, § 16, is easily understandable and therefore Ohioans in the 1800s would understand that it "provide[d] a presumption of public access to juvenile court proceedings," majority opinion at ¶ 39; *see id.* at ¶ 40.

{¶ 90} While the majority's conclusions might potentially be true, the majority does not prove their truth by merely declaring them to be so. The majority has not conducted a substantive, independent interpretation of the open-courts provision as applied to juvenile-court proceedings here with its generic citations and non sequiturs. In fact, the majority's ultimate analysis here leaves the impression that it wants to explore judicial federalism in this case just for the sake

of it—as though it has a solution in search of a problem. *See* Howard, *State Courts and Constitutional Rights in the Day of the Burger Court*, 62 Va.L.Rev. 873, 940-941 (1976) ("The case for an independent role for state courts should not be read as a case for unthinking activism. No judge, state or federal, is a knight errant, whose only concern is to do good."); *see also* Abraham Kaplan, *The Conduct of Inquiry: Methodology for Behavioral Science* 28 (1964) ("Give a small boy a hammer, and he will find that everything he encounters needs pounding.").

**{¶ 91}** Despite already having declared what it believes to be the true meaning of the open-courts provision, the majority returns to criticizing this court's holdings in *T.R.* and *Geauga* for relying on the statements in federal cases that "'juvenile court proceedings have historically been closed to the public,' " majority opinion at ¶ 41, quoting *T.R.*, 52 Ohio St.3d at 15, and *Geauga*, 2000-Ohio-35, at ¶ 18. The majority indicates that such a historical analysis is irrelevant outside the First Amendment, but it goes on to argue that our historical understanding of juvenile-court proceedings in Ohio should be limited to whatever procedures were used to govern juveniles prior to the 1802 or 1851 Ohio Constitutions and should not be based on the proceedings specifically put in place when the juvenile-court system began to form, starting around 1857. The majority then notes that juveniles used to be tried as adults for crimes under the common law and concludes that juvenile-court proceedings have historically been open to the public because they were historically the same as adult-court proceedings.

**{¶ 92}** Because the majority's historical account is limited to juvenile-delinquency proceedings, it is not particularly relevant to *T.R.*—a decision regarding custody and dependency proceedings. Moreover, this court already held in *Geauga* that the public has a particularly strong interest in juvenile-delinquency proceedings involving serious offenses*, Geauga* at ¶ 41, and that such proceedings are analogous to adult-court proceedings, *id.* at ¶ 23. We held that the juvenile court may not close such proceedings without first weighing the public's interest in

44

the openness of the proceedings and that the burden to prove that closure is warranted rests on the person seeking closure of the proceedings. *Id.* at ¶ 33. Nothing about the majority's historical account supports the notion that *T.R.* or *Geauga* should be overturned.

{¶ 93} Irrespective of what the true meaning of the open-courts provision might be, the majority's generic analysis fails to support its specific claims. And irrespective of the accuracy or appropriateness of the majority's historical account of juvenile courts in Ohio, it fails to justify the majority's decision to sua sponte overturn *T.R.* and *Geauga*.

### III. JUDICIAL FEDERALISM MUST BE APPLIED WITH RESTRAINT

{¶ 94} I agree with the majority that when we apply the provisions of our own state Constitution, blindly "lockstepping" with federal jurisprudence under the United States Constitution is not a good default practice. But just as I should not dissent in this case merely because I disagree with the majority's analysis, we should not overturn *T.R.* and *Geauga* simply because our analysis in those cases relied on First Amendment jurisprudence.

{¶ 95} As a general matter, I agree with United States Supreme Court Justice Brennan that "[s]tate constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law." Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.Rev. 489, 491 (1977). It is important to interpret our state Constitution independently, particularly when failing to do so would cede the extra protections our Constitution provides above the floor provided by the federal Constitution. And the potential risk of ceding state constitutional protections is certainly apparent, considering the difference between the text of the Ohio Constitution's open-courts provision and the text of the First Amendment.

{¶ 96} Article I, Section 16 of the Ohio Constitution provides:

> All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay.  Suits may be brought against the state, in such courts and in such manner, as may be provided by law.

The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Although there is some overlap among certain provisions in the above-quoted language, the First Amendment does not contain the phrase "[a]ll courts shall be open."

{¶ 97} The First Amendment has been construed as the protector of the right to open courts, but the right itself is derived from the common law and not explicitly provided in the United States Constitution.  *See Richmond*, 448 U.S. at 567 (1980) (inferring that the public's right to open trials is protected by the United States Constitution because trials were presumed to be open under the English common law); *see also id.* at 577 (the right of access to court proceedings "may be seen as assured by the amalgam of the First Amendment guarantees of speech and press").  We can hardly ensure the endurance of the protections provided by Ohio's open-courts provision by equating it to something that is only inferred from the United States Constitution.  So I agree with the majority when it states that we absolutely should not "'irreversibly tie' our state constitutional jurisprudence to *future* United

States Supreme Court decisions," (emphasis in original) majority opinion at ¶ 30, quoting *Simmons-Harris v. Goff*, 1999-Ohio-77, ¶ 30.

{¶ 98} It is perfectly fine for us to cut out the middleman—the analysis of Ohio's open-courts provision under the First Amendment—since our dedication to open courts is explicitly provided for in our state Constitution. But that does not mean that our previous decisions are dead to us for having dared to consort with that middleman. It would be particularly inappropriate to overturn those previous decisions when, as here, First Amendment principles and the open-courts provision support the same outcome.

{¶ 99} The majority has failed to establish that First Amendment jurisprudence does not adequately protect the Cincinnati Enquirer's interest in obtaining access to the juvenile-court proceedings at issue in this case, and it has also failed to provide any substantive insight into the relationship between juvenile-court proceedings and the open-courts provision in Article I, Section 16 of the Ohio Constitution. The majority's lack of reasoned analysis is particularly problematic because it does not stop at the point of its holding that the denial of the Cincinnati Enquirer's request for the previously sealed records of a deceased juvenile was unconstitutional. Instead, it goes a step further and holds that the juvenile court's original decision to seal the records—when the juvenile was still alive—was unconstitutional. The majority goes even further still and indicates that all juvenile-court proceedings—not just juvenile-delinquency proceedings—must be open unless there is first an individualized weighing of interests that overcomes the presumption of openness. The majority provides no relevant history, apposite caselaw, or sound reasoning to support its absolutist conclusions.

{¶ 100} A fundamental tenet of judicial restraint when determining the constitutionality of statutes is "never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Liverpool, N.Y. & P.S.S. Co. v. Emigration Commrs.*, 113 U.S. 33, 39 (1885). Constitutional

rulings that are broader than needed for the facts presented "would be an attempt to settle questions of law involving the rights of persons without parties before it, or a case to be decided in due course of law" in violation of the second and third provisions of Article I, Section 16 of the Ohio Constitution. *State v. Baughman*, 38 Ohio St. 455, 459 (1882). Although the subject of this action involves only the first provision of Article I, Section 16, the majority needs to respect its role regarding the other two provisions when conducting its analysis.

{¶ 101} Because justice in our State and nation is achieved through the adversarial process, a court must maintain "the role of neutral arbiter of matters the parties present," *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). "'[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties.'" *Id*. at 244, quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring). We must also adhere to "'the cardinal principle of judicial restraint,'" which is that "'if it is not necessary to decide more, it is necessary not to decide more.'" *Meyer v. United Parcel Serv., Inc.*, 2009-Ohio-2463, ¶ 53, quoting *PDK Laboratories, Inc. v. United States Drug Enforcement Administration*, 362 F.3d 786, 799 (D.C.Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment).

{¶ 102} As noted above, to the extent that *T.R.* and *Geauga* were even mentioned in the parties' briefs, the Cincinnati Enquirer cited them as support for its argument that the writs should issue and that the statutory scheme should be declared unconstitutional. And as I have explained in my analysis above, the Cincinnati Enquirer is correct. The weighing test in *T.R.* and *Geauga* may be weaker than the weighing test promoted by the majority, but that difference in no way affects the outcome of this particular case. For the majority to validly overturn *T.R.* and *Geauga*, it needs to wait for a case in which the difference between the tests actually matters to the outcome and in which the parties actually argue the

issue. We would also be well served by the majority's waiting to decide on the proper standard for weighing competing constitutional interests when a key party whose individual interests are most at stake—the juvenile—is alive and able to articulate those interests to the court.

{¶ 103} The majority is trying really hard to make judicial federalism happen. But if the majority wants to convince the legal profession and the general public that judicial federalism is anything other than a vehicle for historical cherry-picking on the road to results-oriented jurisprudence, then it needs to do better than this. If we want to succeed in making judicial federalism a preferred method of analysis, not to mention respect the rule of law, we have to be patient, methodical, and, above all, principled. If we make it look like a choice between a lockstep approach and judicial activism, lockstep will more likely be the choice of future generations.

{¶ 104} In light of my disagreement with the majority's reasoning but my agreement with its ultimate disposition, I concur in judgment only.

_____

**STEWART, J., joined by BRUNNER, J., dissenting.**

{¶ 105} Relator, the Cincinnati Enquirer, a division of Gannett GP Media, Inc. ("the Enquirer"), filed this original action under Sup.R. 47(B) seeking a writ of mandamus to obtain a copy of a trial transcript sealed by respondent, Judge Kari L. Bloom of the Hamilton County Court of Common Pleas, Juvenile Division. To be entitled to the writ of mandamus it has requested, the Enquirer must show that it has a clear right to the record it seeks and that Judge Bloom has a clear legal duty to unseal the record. *State ex rel. Cincinnati Enquirer v. Lyons*, 2014-Ohio-2354, ¶ 11. The Enquirer has shown neither.

{¶ 106} In 2022, Judge Bloom presided over a juvenile-delinquency proceeding in which J.L. was accused of conduct that would constitute the crime of felonious assault if committed by an adult. J.L. was 13 years old at the time. Judge

Bloom found J.L. not delinquent, which is analogous to a not-guilty finding in adult court.[17]

{¶ 107} Thereafter, Judge Bloom sealed the records of J.L.'s juvenile-delinquency proceeding under R.C. 2151.356(B)(1)(d), which states:

> The juvenile court *shall* promptly order the immediate sealing of records pertaining to a juvenile in any of the following circumstances:
>
> . . .
>
> If a complaint was filed against a person alleging that the person was a delinquent child, an unruly child, or a juvenile traffic offender and the court dismisses the complaint after a trial on the merits of the case or finds the person not to be a delinquent child, an unruly child, or a juvenile traffic offender.

(Emphasis added.) There is no dispute that the relevant statute requires the juvenile court to "promptly order the immediate sealing of the records" in the circumstances of J.L.'s case.

{¶ 108} In fact, the Enquirer conceded in its amended complaint that Judge Bloom sealed the records in accordance with R.C. 2151.356 and that "R.C. 2151.356 mandates that a juvenile court seal court records in a juvenile delinquency proceeding upon a finding that the juvenile is not delinquent." In other words, the Enquirer has alleged that Judge Bloom complied with her legal duty. Therefore,

---

17. A delinquent child includes any child who violates a state law that would be an offense if committed by an adult. R.C. 2152.02(E)(1). If the juvenile court, at an adjudicatory hearing, finds beyond a reasonable doubt that the child is delinquent for having committed a certain offense, it can procced to a disposition of the child. R.C. 2151.35. A disposition may include any number of restrictions imposed by the court, including placement of the child in a detention facility. *See generally* R.C. 2152.19.

the Enquirer cannot show that it is entitled to relief in the form of an extraordinary writ.

**{¶ 109}** But the Enquirer argues, however, that R.C. 2151.356 is unconstitutional under the open-courts provision of Article I, Section 16 of the Ohio Constitution because the statute "does not require a court to apply the requirements of the Open Courts provision, as construed by this Court." As construed by this court, however, the open-courts provision does not grant the Enquirer a *constitutional right* to access the sealed transcript. *See State ex rel. Dispatch Printing Co. v. Geer*, 2007-Ohio-4643; *State ex rel. Plain Dealer Publishing Co. v. Floyd*, 2006-Ohio-4437; *State ex rel. Plain Dealer Publishing Co. v. Geauga Cty. Court of Common Pleas, Juvenile Div.*, 2000-Ohio-35 ("*Geauga*").

**{¶ 110}** When a juvenile court has discretion to restrict public access to juvenile-delinquency proceedings in the absence of a presumption that such proceedings are either opened or closed, this court has applied the following standard:

> [U]nder the applicable standard, a juvenile court may restrict public access to delinquency proceedings if, after hearing evidence and argument on the issue, the court finds that (1) there exists a reasonable and substantial basis for believing that public access could harm the child or endanger the fairness of the adjudication, (2) the potential for harm outweighs the benefits of public access, and (3) there are no reasonable alternatives to closure.

*Id.* at ¶ 27, citing *In re T.R.*, 52 Ohio St.3d 6 (1990), paragraph three of the syllabus, and *State ex rel. Dispatch Printing Co. v. Lias*, 1994-Ohio-335, paragraph one of the syllabus. And even though we have granted extraordinary relief allowing access to juvenile-delinquency proceedings when the juvenile court did not hold a hearing

or make the required findings before closing the proceedings—*see, e.g.*, *Geauga* at ¶ 43; *Floyd* at ¶ 40; *Geer* at ¶ 19—those cases involved circumstances in which the juvenile court had *discretion* to close the proceedings. Here, the juvenile court's sealing of J.L.'s record is in accordance with R.C. 2151.356, which leaves the juvenile court with no discretion about whether to seal the trial transcript. Even if the statute did grant the juvenile court discretion to seal the record, we have not found in the relevant constitutional provisions an *absolute right* of public access by the media and, in the circumstances of this case, the General Assembly has made a policy determination to protect the case records of a child who has been determined not to be delinquent. "[I]t is a proper role of the General Assembly to balance competing private and public rights." *State ex rel. Cincinnati Enquirer v. Winkler*, 2004-Ohio-1581, ¶ 9, *superseded by statute on other grounds as stated in In re Disqualification of Celebrezze*, 2023-Ohio-4383. Therefore, the Enquirer cannot show, even under its constitutional argument, that it is entitled to extraordinary relief in the form of a writ of mandamus that would allow it to obtain a copy of the transcript from the juvenile-court proceedings in J.L.'s case.[18]

{¶ 111} This should have been the end of the majority's analysis. But instead, the majority has independently decided to announce a novel interpretation and application of the open-courts provision of the Ohio Constitution to juvenile-court proceedings. Because the majority's analysis is flawed, I dissent.

{¶ 112} The majority begins its opinion by presenting out of context the limited phrase comprising the open-courts provision, stating that the Ohio Constitution "commands that '[a]ll courts shall be open,' " majority opinion, ¶ 1. The phrase appears in the Ohio Constitution, Article I, Section 16, which is titled "Redress for injury; Due process" and which states:

---

18. The Enquirer can likewise show no entitlement to a writ of prohibition, which it also seeks. *See Lyons*, 2014-Ohio-2354, at ¶ 38 (denying writ of prohibition when the relator did not establish a clear legal right to records it requested).

> All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law.

{¶ 113} We have recognized that "[t]his one provision contains many important constitutional principles—'open courts,' 'right to remedy,' and 'due course of law.' " *Ruther v. Kaiser*, 2012-Ohio-5686, ¶ 10. Despite the different ways one could interpret that phrase (for example, that the courthouse be open to all litigants who wish to file suit), the majority concludes that the plain text and "our traditional understanding" of the phrase "[a]ll courts shall be open" demonstrate that "the Ohio Constitution forbids the sealing of court records unless the judge makes an individualized determination that the harm to the juvenile from disclosure outweighs the potential benefits of public access," majority opinion at ¶ 2. This conclusion displays the type of mental gymnastics that even the Enquirer did not perform. The Enquirer never argued this. The Enquirer also did not argue, as the majority concludes, that our case law—a few decades of case law, in fact— was wrongly decided and should not be controlling. *See* majority opinion at ¶ 16. Yet, despite the absence of these arguments from the parties, the majority finds on its "independent interpretation" that the phrase "[a]ll courts shall be open" requires that we grant the writ requested by the Enquirer. The majority even announces that its interpretation "comports with the values underlying" the text of that provision, majority opinion at ¶ 56, suggesting a new interpretive principle that dangerously

depends on an individual jurist's subjective view of what "values" certain words might express.[19]

{¶ 114} The majority's ability to divine such clarity from what it asserts is the text, history, and tradition (and, somehow, the values) of the open-courts provision is puzzling, because this court has already concluded that history offered us little help interpreting the provision. In *T.R.*, 52 Ohio St.3d at 13-14, this court explained:

> Though the open courts provision has been a part of our Constitution since Ohio was admitted to the Union, we cannot resolve this issue by reference to the debates and comments of the drafters. The records of the 1802 convention indicate that the original open courts provision, Section 7, Article VIII, Constitution of 1802, was enacted without amendment or discussion. *See E.W. Scripps Co. v. Fulton* (1955), 100 Ohio App. 157, 171-172, 60 O.O. 147, 155, 125 N.E.2d 896, 908 (Hurd, J., concurring). At the 1850-1851 convention, this section was carried into the current Bill of Rights unchanged, *id.* at 172, 60 O.O. at 155, 125 N.E.2d at 906, and without discussion relating to the question of public access. The 1873-1874 constitutional convention made no changes in this section, and the 1912 convention also left the words of the 1802 drafters unaltered, though it added a sentence not at issue in the instant case. *Id.*

---

19. Suggesting there are "values underlying" the text of constitutional or statutory law implies that the majority is making a policy determination, and policy determinations are within the province of the legislative, not the judicial, branch of the government. *See Gabbard v. Madison Local School Dist. Bd. of Edn.*, 2021-Ohio-2067, ¶ 80 (Fischer, J., dissenting) ("We are not to invade the role of the legislature to write laws and make policy determinations.")

We also cannot resolve this issue by simplistically viewing the phrase "[a]ll courts shall be open" as an absolute command applicable in all courts in all situations. It is a hallmark of American constitutional jurisprudence that many provisions of our Constitutions, though phrased in absolute terms, do not create absolute rights. For example, though the First Amendment's guarantee of freedom of speech is phrased in absolute terms, it "would not protect a man in falsely shouting fire in a theatre and causing a panic." *Schenck v. United States* (1919), 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470. Nor would it protect a seller of obscene material, *Roth v. United States* (1957), 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, or one who defames another with actual malice, *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686.

Certain phases of Ohio court proceedings—such as grand jury hearings, petit jury deliberations, conferences in chambers, the issuance of search warrants, and the conferences of collegial courts such as ours—have been closed to the public both before and after the adoption of our Constitution.

For example, the grand jury has been used in Ohio criminal jurisprudence since the first Court of General Quarter Sessions was held in Marietta in 1788. A History of the Courts and Lawyers of Ohio (1934) 51-52. Grand jury hearings were closed to public access in the days of the English common law, 1 LaFave & Israel, Criminal Procedure (1984) 602-603, Section 8.2(a), and have remained presumptively closed to this day, see *Petition for Disclosure of Evidence* (1980), 63 Ohio St. 2d 212, 17 O.O. 3d 131, 407 N.E. 2d 513. If the drafters had intended the open courts provision to create

an absolute right of public access, these grand jury proceedings could not be closed to the public.

{¶ 115} Despite the lack of documented history to shed light on the meaning of the open-courts provision as described in *T.R.*, the majority in this case declares that the court in *T.R.* "didn't examine the history of the Ohio provision" and "didn't analyze its text" but "simply announced" that the right of public access to court proceedings under the open-courts provision is the same as that provided under the First Amendment to the United States Constitution, majority at ¶ 25. But the court in *T.R. did* examine the history and the text; the majority here simply chooses not to agree with it.

{¶ 116} In fact, this court in *T.R.* determined, based on its analysis of the text and history of the open-courts provision, that "the open courts provision of the Ohio Constitution creates no greater right of public access to court proceedings than that accorded by the Free Speech and Free Press Rights Clauses of the First Amendment to the United States Constitution and the analogous provisions of Section 11, Article I of the Ohio Constitution." *T.R.* at 14. The Enquirer has not asked us to revisit this precedent. Nevertheless, the majority has decided that its ideological disagreement with this court's interpretation of the open-courts provision in *T.R.* allows it to ignore the lack of argument and advocacy from the parties, ignore the principles of stare decisis,[20] and contort the spirit of judicial restraint to announce its independent view of what the open-courts provision means: this is the very definition of judicial activism.

---

20. Stare decisis is a "long revered" doctrine "designed to provide continuity and predictability in our legal system" and is a "means of thwarting the arbitrary administration of justice as well as providing a clear rule of law by which the citizenry can organize their affairs." *Westfield Ins. Co. v. Galatis*, 2003-Ohio-5849, ¶ 43.

**{¶ 117}** Interestingly, the justices comprising today's majority have determined in other cases that when a party fails to raise an argument that a particular provision of the Ohio Constitution provides greater constitutional protection than that offered in an analogous provision of the federal Constitution, we are prevented from resolving the question on our own. *See State v. Carter*, 2024-Ohio-1247, ¶ 67 (Fischer, J., concurring, joined by Donnelly and Deters, JJ.) ("Because Carter did not develop a confrontation claim under the Ohio Constitution, the majority opinion appropriately limits its analysis of Carter's proposition of law to the Confrontation Clause of the Sixth Amendment to the United States Constitution."); *State v. Jordan*, 2021-Ohio-3922, ¶ 14 (O'Connor, C.J., joined by Kennedy, Fischer, and DeWine, JJ.) (because appellant offered no basis for treating the Fourth Amendment to the United States Constitution differently from the Ohio Constitution, Article 1, Section 14, the court addressed only the Fourth Amendment); *Stolz v. J & B Steel Erectors*, 2018-Ohio-5088, ¶ 29 (Fischer, J., concurring) ("Because the parties in this case did not challenge this court's traditional understanding of [Ohio's Equal Protection Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution] as functionally equivalent, the majority properly follows that precedent."); *State v. Moore*, 2018-Ohio-3237, ¶ 41 (Fischer, J., concurring in judgment only, joined by O'Connor, C.J.) (concluding that because the issue whether the equal-protection provisions of the Ohio and federal Constitutions are "functionally equivalent" was not raised or briefed, it was "inappropriate for us to settle it" at that time); *Id.* at ¶ 41 (majority opinion authored by DeWine, J., joined by Kennedy, French, and Laster Mays, JJ.) (agreeing with the opinion concurring in judgment only that "this is not an appropriate case to take up the question whether [the Equal Protection Clauses of the Ohio and federal Constitutions] should be given different treatment," because no party had suggested that we do so); *Cleveland v. Oles*, 2017-Ohio-5834, ¶ 31, fn. 1 (majority opinion authored by O'Connor, C.J., joined by O'Donnell,

Kennedy, French, Fischer, and DeWine, JJ.) ("We decline to extend our holding in [*State v. Farris*, 2006-Ohio-3255,] regarding the protection offered by the Ohio Constitution beyond the scope of that case, particularly without argument from the parties regarding whether the Ohio Constitution provides greater protection than the Fifth Amendment in this scenario.")

{¶ 118} Indeed, the approach employed in the cases cited above ensures that this court adheres to the principles of judicial restraint. But here, for whatever reason, the majority has opted to ignore its prior cautions and, instead, independently raises and applies its "independent interpretation" of the historical and traditional understanding of the open-courts provision.

{¶ 119} In doing so, the majority dismisses the historical protections for juveniles—protections that are inherent in the creation of our juvenile-court system. For example, the majority states, "In holding that the constitutional presumption of access does not apply to juvenile courts, the *Geauga* and *T.R.* courts placed great weight on their *assumption* that '[j]uvenile court proceedings have historically been closed to the public,' " (emphasis added) majority opinion at ¶ 41, quoting *Geauga*, 2000-Ohio-35, at ¶ 18. But that was not an "assumption." It is a fact that juvenile-court proceedings have historically been closed to the public. *See Geauga* at ¶ 18 ("Juvenile court proceedings have historically been closed to the public, and public access to these proceedings does not necessarily play a significant positive role in the juvenile court process."); *T.R.*, 52 Ohio St.3d at 15 ("The United States Supreme Court has repeatedly recognized that juvenile court proceedings have historically been closed to the public."); *In re Agler*, 19 Ohio St.2d 70, 80 (1969) ("Like indictment, the privacy of juvenile proceedings in themselves offers protection to a child from the adverse effect of groundless charges upon his reputation."); *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 107 (1979) (Rehnquist, J., concurring in the judgment) ("It is a hallmark of our juvenile justice system in the United States that virtually from its inception at the end of the last century its proceedings have been

conducted outside of the public's full gaze and the youths brought before our juvenile courts have been shielded from publicity.").

{¶ 120} Indeed, this "hallmark of our juvenile justice system"—that proceedings include some protection for children from unqualified publicity—is part of the history and tradition of juvenile courts, which have been part of Ohio's court system since 1902, when the first juvenile court was established in Cuyahoga County by the General Assembly, *see T.R.* at 15. If we must, as the majority says, construe the state Constitution by looking to the text of the document as understood in light of our history and traditions, then the analysis *should actually include* our history and traditions, not just the majority's selectively chosen words and phrases to support its desired outcome.

{¶ 121} To get around more than a century of history, the majority ignores it by simply concluding that the history is irrelevant because juvenile courts did not exist when Ohio's constitution was drafted.[21] *See* majority opinion at ¶ 42. The majority also rather bizarrely concludes that because juvenile courts have not always existed, "[t]he historical analogue to present-day juvenile delinquency proceedings was a trial of the juvenile in adult court," *id.* at ¶ 45. But there is no "historical analogue" to "present-day juvenile proceedings." Today's juvenile-justice system, the one recognized in this state for more than a century, was created and developed to be *distinct* from adult-court proceedings because it was widely accepted that adult-court proceedings are ill-equipped to deal with the unique requirements of a delinquency system for children, which is more amenable to rehabilitation. *See Agler* at 71-72 ("The Juvenile Court stands as a monument to the enlightened conviction that wayward [children] may become good [adults] and

---

21. Even if technically true that the formal existence of juvenile courts postdated the drafting of Ohio's constitution, the General Assembly, in 1857, established "houses of refuge" as an alternative means of correction for children accused of having committed a crime, rather than having them indicted by a grand jury. *See In re Agler* at 72.

that society should make every effort to avoid their being attainted as criminal before growing to the full measure of adult responsibility. Its existence, together with the substantive provisions of the Juvenile Code, reflects the considered opinion of society that childish pranks and other youthful indiscretions, as well as graver offenses, should seldom warrant adult sanctions and that the decided emphasis should be upon individual, corrective treatment."). The majority's decision to erase over a century of history and tradition as well as decades of established jurisprudence because a snapshot of history of 1851 included no juvenile courts within its frame is far from a restrained approach to the question before us.

{¶ 122} Further evidence of the majority's faulty reliance on sources to promote its outcome is its insistence that its interpretation of the constitutional text here comports with "the values underlying" that text. Accepting for a moment that any individual judge has the interpretive insight to determine the "values" underlying a text in any objective and unbiased way, the majority's citing *State v. Hensley*, 75 Ohio St. 255 (1906), does not support its conclusion. The court in *Hensley* did say, as the majority quotes, that "'the people have the right to know what is being done in their courts,' " majority opinion at ¶ 56, quoting *Hensley* at 266, but in *Hensley*, this court was referring to the right to a public trial under a different section of the Ohio Constitution, and the outcome of that case was not, as the majority suggests, premised on the open-courts provision. The public-trial right is not at issue here, because the Enquirer has made no claim that it requested to attend J.L.'s juvenile-court proceedings and was denied access.

{¶ 123} The majority does recognize, albeit in just one sentence, that there exist "strong interests in protecting the privacy of juveniles—particularly when a juvenile has been judged not to be delinquent." Majority opinion at ¶ 57. But the majority fails to give credit to these interests as also being part of the "values" that might inform the constitutional text and instead cites to "countervailing interests"

to the privacy of juveniles, *id*. The "countervailing interests" the majority cites are from a decision in which this court recognized that a juvenile court *may close* the courtroom to media so long as it makes the necessary findings after hearing evidence and arguments on the issue. *See State ex rel. Plain Dealer Publishing Co. v. Floyd*, 2006-Ohio-4437, ¶ 27. The majority goes on to say that "history is rife with examples of abuse of juveniles in our justice system—abuse that was often perpetuated by closing our juvenile system from public scrutiny." Majority opinion at ¶ 57. But the sources cited for that statement are three news articles detailing corruption found in juvenile courts in Pennsylvania, Tennessee, and Texas—not Ohio—and a novel that details a fictional account of an actual reform school in Florida that was known for its cruelty and abuse. This criticism of the majority's analysis is not to suggest that we should ignore the potentially competing interests of confidentiality and public access to proceedings involving juveniles or turn a blind eye to abuse by officials in the juvenile-justice system. Indeed, there exists both a strong interest in protecting the privacy interests of juveniles *as well as* a strong interest in allowing public access to juvenile-court proceedings and ensuring fairness in the juvenile-justice system. This critique is to call attention to the majority's lack of support for its interpretation of the so-called history and tradition of the Ohio Constitution's open-courts provision while overlooking the traditional interests of confidentiality and rehabilitation that this court has already recognized as hallmarks of the juvenile-justice system.

{¶ 124} Tellingly, after all the work the majority puts in to explain how this court's precedent was wrongly decided and announcing a novel reading of the constitutional text at issue, the majority remarkably ends up in the same place as the case law that the majority suggests was wrongly decided. Prior to today's ruling, we recognized a "qualified right of public access to proceedings which have historically been open to the public and in which public access plays a significantly positive role," *State ex rel. Scripps Howard Broadcasting Co. v. Cuyahoga Cty.*

*Court of Common Pleas, Juvenile Div.*, 73 Ohio St.3d 19, 20 (1995), citing *T.R.*, 52 Ohio St.3d at paragraph two of the syllabus; *In re Disqualification of Clark*, 2023-Ohio-4774, ¶ 54 (quoting the above-quoted portion of *Scripps*). And, for juvenile courts more specifically, which have been neither presumptively open nor presumptively closed to the public, we have recognized that juvenile courts may restrict public access after receiving evidence and arguments on whether (1) there exists a reasonable and substantial basis for believing that public access could harm the child or endanger the fairness of the adjudication and (2) the potential for harm outweighs the benefits of public access. *T.R.* at paragraph three of the syllabus. In other words, juvenile courts must weigh the potential harm to the child or the fairness of the proceeding against the benefits of public access.

**{¶ 125}** Today, the majority announces that "a juvenile delinquency proceeding cannot be closed to the public without an *individualized determination balancing the interests at stake*" (emphasis added), majority opinion at ¶ 60, which, in essence, just replaces a balancing test with a balancing test. Applying that balancing test to the relevant record-sealing statute here, the majority then concludes that R.C. 2151.356, "may not be constitutionally applied without such an individualized determination." *Id.* at ¶ __ [p. 36, l. 13-14].

**{¶ 126}** What was the purpose of the exercise then? It seems that the majority's purpose here is to draw a line against the policy determination the General Assembly made in R.C. 2151.356(B)(1)(d)—that some circumstances warrant prompt and immediate sealing of juvenile records, including when the court finds the child not to be delinquent. By drawing this line, the majority implies that it is solely the province of the juvenile court to conduct the correct balancing test and determine the proper factors to consider. *But see Winkler*, 2004-Ohio-1581, at ¶ 9 ("[I]t is a proper role of the General Assembly to balance competing private and public rights."). In doing so, the majority also ignores that the General Assembly has already established what it deems to be the appropriate factors to balance. For

example, a record sealed under R.C. 2151.356 pertaining to an offense of violence that would be a felony if committed by an adult may be inspected by any law-enforcement officer or any prosecutor for any valid law-enforcement or prosecutorial purpose. R.C. 2151.357(E)(2). The statute details other ways in which the sealed record may be accessed, none of which apply here.

{¶ 127} Even more bizarre, however, the majority does not return the case to the juvenile court to conduct the balancing test it announces here. The majority instead determines, as a matter of law, that a child's juvenile-court record must be unsealed if the child is deceased. *See* majority opinion at ¶ 55. Remarkably, the majority is able to make this bright-line rule without any *individualized determination* of the interests at stake, without consideration of what might be contained in the sealed transcript, without consideration of whether names of witnesses, victims, or family members might warrant protection, and without any analysis of the public's interest in having access to the sealed transcript of a court proceeding at which a now-deceased child was determined to be not delinquent of the offense he was alleged to have committed. At the very least, the majority should do what it instructs and leave the balancing test to the juvenile court.

{¶ 128} In declaring a bright-line rule about a deceased juvenile's interest, the majority does not even bother to analyze the other half of the equation—the public's interest in access to the transcript of the juvenile-court proceedings. If weighing two zeros, then the status quo should prevail. And what remains then of the public's interest in access to the record in a juvenile-court proceeding if the subject of the record is deceased? The majority does not analyze this question, but we can glean some clues from the complaint.

{¶ 129} Attached to the Enquirer's amended complaint filed in this action was a January 3, 2023 press release from the Hamilton County Prosecuting Attorney's Office titled "Hamilton County Prosecutor Joseph T. Deters Announces the Indictment of Dashaun Jones." That press release described the charges against

Jones on, among other things, murder for fatally shooting J.L. in May 2022. The press release stated:[22]

> Last year, [J.L.] was charged with Felonious Assault for his involvement in the shooting of another juvenile. Cincinnati Police officers were nearby and heard shots fired. As they ran towards the scene, officers witnessed [J.L.] standing over the victim, shooting him. [J.L.] stood trial in front of Judge Kari Bloom. Although the victim was not cooperative, the officer testified that he witnessed [J.L.] shoot the victim. Despite this testimony, Judge Bloom found [J.L.] not guilty and he was released from custody.
>
> Months later, [J.L.] himself would be shot and killed.
>
> Hamilton County Prosecutor Joe Deters commented, "This is becoming a systemic problem in Juvenile Court. Any parent understands that children must be appropriately punished for their bad behavior. When you're talking about kids running around and shooting people—the stakes are even higher.
>
> *Treating violent juveniles with kid gloves, and allowing them to walk free after committing serious offenses is not compassion; it is not good for the community; and it certainly is not good for the juvenile defendant."*

(Emphasis added.)

{¶ 130} Although the press release announced that Jones had been indicted and that J.L. was a victim in the case, the statements and details about J.L.'s prior offense imply that the prosecutor's office believed J.L. should have been found

---

22. The press release uses J.L.'s full name.

delinquent and punished. But the details included in the press release about J.L.'s 2022 case demonstrate that the prosecutor's office, law enforcement, *and* the media already had a number of pertinent details about the case involving J.L. to inform the public about the case such that the public could publicly scrutinize the proceedings. The press release made public that in J.L.'s matter, officers had responded to shots fired, that the victim had not been cooperative as a witness, and that at least one officer had testified that he saw J.L. shoot the victim. In addition, someone from the prosecutor's office was, of course, present at the 2022 proceedings involving J.L., so the prosecutor's office was already aware of the details, and there is no allegation from the Enquirer that it sought or was denied permission to attend the proceedings involving J.L. At the time of the press release, J.L. was the victim of a crime that resulted in his death, and therefore, J.L. could not pose a threat to public safety. What remains then appears to be the prosecutor's disagreement with the judge's reasoning for finding J.L. not to be delinquent.

{¶ 131} It is unclear how the prosecutor's disagreement with the judge's not-delinquent determination is an interest relevant in the so-called balancing test the majority has announced. The premise of the majority's decision to grant the Enquirer the writ of mandamus appears to be its assumption that a prosecutor's disagreement with a judge's decision in a case is equivalent to or gives rise to the public's interest in scrutinizing the court proceedings and is at odds with the traditional interests of the confidentiality of juvenile-court proceedings and the rehabilitation of juveniles who are the subject of those proceedings. That false equivalency has no basis in the law—not in the history, the tradition, or the values underlying our juvenile-court system. In fact, we know that the majority's effort to redefine the public interest here as one equivalent to the prosecutor's disagreement with the judge's decision is incorrect because statements defining the public interest in juvenile-court proceedings have already been codified in state law, rendered in court rules, and described for us in the case law documenting the history of the

juvenile-court system.  For example, the General Assembly determined that it is in the public interest that a child's court record be sealed if he or she is found not to be delinquent, R.C. 2151.356(B)(1)(d), yet made available for law-enforcement or prosecutorial purposes if relevant, R.C. 2151.357(E)(2).  Moreover, the Ohio Rules of Juvenile Procedure should be interpreted and construed to, among other things, "*protect the public interest* by treating children as persons in need of supervision, care and rehabilitation."[23]  (Emphasis added.)  Juv.R. 1(B)(4).  And, in *T.R.*, this court described both sides of the public interest in access to the courtroom, noting on the one hand that "the public has an interest in scrutinizing the working of the juvenile court," *T.R.*, 52 Ohio St.3d at 16, but also that "public access to juvenile court proceedings may have harmful effects," including endangering the fairness and order of the proceedings and causing psychological harm to the child, *id.* at 18.

{¶ 132} Again, to be sure, there exists both a strong interest in protecting the privacy interest of juveniles *as well as* a strong interest in public proceedings and fair justice systems.  But in its eagerness to craft policy in the area of access to juvenile-court proceedings, or worse, to endorse a prosecutor's attack of a sitting judge's credibility, the majority's independent interpretation of the open-courts provision and its novel application of it here has implications far beyond this case, including expanding the media's access to a judge's or juror's notes, details regarding child victims in abuse and neglect proceedings, details of spouses and children involved in divorce and custody proceedings, and access to sealed juvenile records of people who are now adults.  As this court already observed in *T.R.*, "[c]ertain phases of Ohio court proceedings—such as grand jury hearings, petit jury deliberations, conferences in chambers, the issuance of search warrants, and the conferences of collegial courts such as ours—have been closed to the public both

---

23. Juv.R. 37(B) states, "No public use shall be made by any person, including a party, of any juvenile court record, including the recording or a transcript of any juvenile court hearing, except in the course of an appeal or as authorized by order of the court or by statute."

before and after the adoption of our Constitution." *Id.* at 13-14. The majority's ungrounded analysis in this case risks opening the door to open-courts challenges to these and many other court processes that exist to promote the public's interest in a fair and functioning court system. It may be that the majority has unwittingly opened the door to rewiring our court system. But for what purpose? To announce a balancing test for what is already the narrowest of record-sealing scenarios in R.C. 2151.356(B)(1)(D)—when a juvenile is found not to be delinquent—and for which the General Assembly has already permitted access under the circumstances listed in R.C. 2151.357(E)(1) through (6).

**{¶ 133}** The Enquirer is not entitled to the extraordinary relief it requested, because it has not shown a clear legal right to the transcript of the juvenile-court proceedings in J.L.'s case and because the trial court judge had no legal duty to provide the Enquirer with a copy of the transcript. The majority's new interpretation of the Ohio Constitution's open-courts provision, in the absence of any argument from the Enquirer seeking such an interpretation, does nothing to change this legal conclusion and serves only to erode the public's confidence in the neutrality of the judiciary by stretching the analytical role of this court to achieve a policy change desired by some members of this court. I would, therefore, deny the Enquirer's request for writs of mandamus and prohibition. Because a majority of this court decides otherwise, I dissent.

_____

Faruki, P.L.L., John C. Greiner, and Darren W. Ford, for relator.

The Honerlaw Firm, L.L.C., Joseph S. Honerlaw, and Candace N. Ayers, for respondent.

Children's Law Center and Alexandra S. Naiman, urging denial of the writs for amicus curiae, Children's Law Center.

_____